CINCINNATI INSURANCE COMPANY, Plaintiff-Respondent,

v.

AM INTERNATIONAL, INC., Defendant-Appellant.

Court of Appeals

*No. 98–0006. Submitted on briefs October 21, 1998.—Decided January 13, 1999.*

(Also reported in 591 N.W.2d 869.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Curtis A. Paulsen* and *John P. Spector* of *Whyte Hirschboeck Dudek, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James J. Kriva* of *Kasdorf, Lewis & Swietlik, S.C.* of Milwaukee.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

SNYDER, P.J.    AM International, Inc., appeals from a summary judgment entered in favor of Cincinnati Insurance Company (Cincinnati) for $75,000. AM International contends that the economic loss doctrine

bars Cincinnati from seeking indemnification for damages sustained by its insured resulting from a defective printing press replacement part manufactured by AM International. Cincinnati argues that because damage resulted to the press, its insured sustained a noneconomic loss, thereby precluding application of the economic loss doctrine. We conclude that the economic loss doctrine is applicable and reverse the trial court.

The printing press at issue is a sheet-fed, six-color offset press manufactured by Harris-Intertype Corporation in 1973. In 1975, Harris-Intertype ceased manufacturing sheet-fed presses but continued to manufacture and sell replacement parts for those presses. Harris-Intertype was later purchased by Harris Graphics, which in turn was purchased by AM International in 1986. AM International continued to operate the sheet-fed press replacement parts business until July 1995.

Cincinnati's insured, Burton & Meyer, Inc., is a Milwaukee area commercial printing company that produces advertising products. In 1991, Burton & Meyer purchased the 1973 Harris-Intertype printing press (the Harris press) from Mid-City Lithographers for $175,000 in an "as is/where is" condition. Sometime between 1986, when AM International acquired Harris-Intertype's replacement parts business, and 1991, when the press was purchased by Burton & Meyer, a transfer cylinder gear in the press was replaced by a transfer cylinder gear manufactured and sold by AM International. This gear is attached to a large drum within the press and serves to drive the drum, which in turn transfers a sheet from one printing unit to the next. On September 12, 1994, one or more of the teeth on the replaced transfer cylinder gear broke off and

caused damage to the press, bringing its production to a halt.

Burton & Meyer suffered over $131,000 in property damage, repair costs and loss of business income. It was compensated for its loss pursuant to its insurance policy with Cincinnati. Cincinnati then brought this subrogation action against AM International for negligence and strict liability. AM International filed a motion for summary judgment, arguing that Cincinnati's claims were barred by the economic loss doctrine. The trial court denied AM International's motion and it now appeals.

The sole issue on appeal is whether the economic loss doctrine applies where a commercial purchaser buys used equipment containing a defective replacement part that causes damage to the equipment and results in repair costs and loss of business income.

■■■

This court reviews summary judgment decisions de novo, applying the same standards employed by the circuit court. *See Smith v. Dodgeville Mut. Ins. Co.*, 212 Wis. 2d 226, 232, 568 N.W.2d 31, 34 (Ct. App.), *review denied*, 215 Wis. 2d 425, 576 N.W.2d 281 (1997). Our supreme court recently addressed the economic loss doctrine in *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 573 N.W.2d 842 (1998), noting that it is a "judicially created doctrine that a commercial purchaser of a product cannot recover from a manufacturer, under the tort theories of negligence or strict products liability, damages that are solely 'economic' in nature." *Id.* at 400, 573 N.W.2d at 844–45. Generally speaking, economic loss refers to a decrease in the value of a product "because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Northridge Co. v.*

460

*W.R. Grace & Co.*, 162 Wis. 2d 918, 925–26, 471 N.W.2d 179, 181 (1991) (quoted source omitted). Direct economic loss includes the loss in value of the product itself, and consequential economic loss includes indirect loss, such as a loss of profits resulting from an inability to use the defective product. *See id.* at 926, 471 N.W.2d at 181–82.

> The economic loss doctrine, however, does not bar a commercial purchaser's claims based on personal injury or damage to property other than the product, or economic loss claims that are alleged in combination with noneconomic losses. In short, economic loss is damage to a product itself or monetary loss caused by the defective product, which does not cause *personal injury or damage to other property*.

*Daanen*, 216 Wis. 2d at 402, 573 N.W.2d at 845 (emphasis added; citations omitted).

Although Cincinnati does not seek damages for personal injury, it does claim that the damage to the press, apart from the defective gear, constitutes "damage to other property," and thus noneconomic loss. In support of its argument, Cincinnati cites *Tony Spychalla Farms, Inc. v. Hopkins Agricultural Chemical Co.*, 151 Wis. 2d 431, 444 N.W.2d 743 (Ct. App. 1989), in which the defendant's defective chemicals damaged the plaintiff's potato crop. There, the court determined that the economic loss doctrine did not apply because the plaintiff's potato crop was "other property." *See id.* at 438, 444 N.W.2d at 747. Cincinnati also relies on *Northridge*, where the plaintiffs sued for property damage to its shopping mall, decreased property value and lost profits resulting from the defendant's defective asbestos fireproofing material. *See Northridge*, 162 Wis. 2d at 924, 471 N.W.2d at 181.

The supreme court declined to apply the economic loss doctrine, holding that the plaintiffs properly stated a claim for tort damages to property other than the asbestos product itself. *See id.* at 937–38, 471 N.W.2d at 186–87.

AM International counters that "[t]he rule in Wisconsin is that where two pieces of equipment are 'component parts in a single system,' damage by one to the other is not damage to 'other property' for purposes of the economic loss doctrine." AM International points to *Midwhey Powder Co. v. Clayton Industries,* 157 Wis. 2d 585, 460 N.W.2d 426 (Ct. App. 1990), in which the plaintiff purchased an energy production system that was comprised, in part, of steam generators manufactured by the defendant. When the defendant's generators failed, damage resulted to the generators and to turbines that were attached to the generators as part of the whole energy system. *See id.* at 589–90, 460 N.W.2d at 428–29. The court concluded as a matter of law that "because of the integral relationship between these two pieces of machinery, component parts of a single system, the turbines are not 'other property,' and, therefore, damage to the turbine does not permit a tort claim against the manufacturer of the generator." *Id.* at 591, 460 N.W.2d at 429.

AM International also contends that *Midwest Helicopters Airways, Inc. v. Sikorsky Aircraft,* 849 F. Supp. 666 (E.D. Wis. 1994), is instructive. In *Midwest,* the defendant manufactured a helicopter that was later purchased by the plaintiff. *See id.* at 667. Due to a faulty tail rotor drive system, the helicopter was destroyed in a crash, resulting in loss of revenue. *See id.* at 667–68. Applying Wisconsin law, the District Court for the Eastern District of Wisconsin determined

that the destruction of the helicopter did not constitute damage to "other property." The court stated:

> Like *Midwhey*, this case involves a single piece of machinery with component parts. Although Midwest now contends that the defective tail rotor drive system was separate property, I do not find that argument persuasive. . . . [I]n *Midwhey*, the court held that the turbines ceased to be separate property even though they had been manufactured by another company. In this case, there are no allegations that Sikorsky provided only the tail rotor drive system. Even if it had, following *Midwhey's* "integral system" test, I would still find that the tail rotor drive system was not "other property."

*Id.* at 672.

Consistent with *Midwhey's* "integral system" test, we are persuaded that AM International's gear is a component part of the Harris press and the rest of the press cannot be considered "other property" for purposes of the economic loss doctrine. The replacement gear was specifically designed by AM International to replace gears in the press. As such, it has no function apart from the machine for which it was manufactured. Cincinnati's attempt to compare the replacement gear with the agriculture chemicals in *Tony Spychalla Farms* and the asbestos material in *Northridge* is unavailing because neither of these products belongs to an integrated system.

Cincinnati argues that unlike the component parts in *Midwhey* and *Midwest*, AM International's replacement gear is not part of a single system because it was manufactured at a different time and by a different company than the press was manufactured. We disagree.

463

At the time Burton & Meyer purchased the eighteen-year-old Harris press for $175,000, the cost of a new press was between approximately $1,500,000 and $2,000,000. In exchange for a discounted machine, Burton & Meyer received a press in an "as is/where is" condition with no guarantee as to its performance. Considering the age of the press, it should have been no surprise to Burton & Meyer that the press contained replacement parts. We conclude that it is immaterial that defective parts of a machine are replacements for purposes of the economic loss doctrine.[1]

Cincinnati further argues that because AM International only obtained the right to manufacture and sell replacement parts to Harris presses, it is not the legal "successor" to Harris-Intertype. While this may be true, we fail to see its significance. In *Midwhey*, the manufacturer of the defective generators was different from the company that designed the entire energy system. *See Midwhey*, 157 Wis. 2d at 588, 460 N.W.2d at 428. Consequently, we are not persuaded that AM International's successor status has any bearing on the economic loss doctrine.

---

[1] In *Sea-Land Service, Inc. v. General Electric Co.*, 134 F.3d 149 (3d Cir. 1998), the Third Circuit Court of Appeals similarly held that replacement parts comprise an integrated system for purposes of the economic loss doctrine. The court stated:

> Sea-Land has not convinced us . . . that there is any rational reason to deviate from the integrated product rule simply because the defective component happens to be a replacement part instead of the part originally supplied with the product. The law is clear that if a commercial party purchases all of the components at one time, regardless of who assembles them, they are integrated into one product. Since all commercial parties are aware that replacement parts will be necessary, the integrated product should encompass those replacement parts when they are installed in the engine.

*Id.* at 154 (citations omitted).

■

The public policies underpinning the economic loss doctrine also support the application of the doctrine in this case. In *Daanen*, the supreme court recognized the following policies:

> (1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.

*Daanen*, 216 Wis. 2d at 403, 573 N.W.2d at 846.

■

While contract law is "designed to effectuate exchanges and to protect the expectancy interests of parties to private bargained-for agreements," tort law and, in particular, products liability and negligence law work "to protect consumers from unreasonably dangerous goods that cause personal injury and damage to other property." *Id.* at 404–05, 573 N.W.2d at 846. Contract law and warranty law are "better suited than tort law for dealing with purely economic loss in the commercial arena." *Id.* at 404, 573 N.W.2d at 846. Here, Burton & Meyer's losses are solely economic. Because Cincinnati's claims are for negligence and strict liability, it is "attempting to recover in tort what are essentially contract damages." *Id.* at 407, 573 N.W.2d at 847. That Burton & Meyer was not in privity of contract is of no consequence. *See id.* at 406, 573 N.W.2d at 847.

■

The economic loss doctrine also "serves to protect commercial parties' freedom to contract." *Id.* at 407,

573 N.W.2d at 847. When Burton & Meyer contracted with Mid-City Lithographers to purchase the Harris press, it obtained a discounted price for the eighteen-year-old press in exchange for the full risk of the press's performance. If Burton & Meyer wanted a performance guarantee, it could have negotiated for a warranty. *See id.* at 408, 573 N.W.2d at 848. However, Burton & Meyer chose not to; instead, it contracted with Cincinnati to insure the risk. If Burton & Meyer or Cincinnati were now able to recover in tort for what Burton & Meyer chose not to contract for, AM International would be prevented from limiting its liability by contract. Burton & Meyer would then receive a full warranty against economic risk without having negotiated or paid for the warranty. *See id.* at 408–09, 573 N.W.2d at 848. In effect, this would "perversely encourage those purchasers to bargain for no warranty or insurance in exchange for a reduced purchase price because they could rely on tort remedies as their 'warranty.' " *Id.* at 408, 573 N.W.2d at 848.

Finally, application of the economic loss doctrine is proper where it encourages the commercial purchaser, as the party best able to assess the risk of economic loss, to assume, allocate or insure against the risk. In the present case, Burton & Meyer did insure against a risk of economic loss and Cincinnati reimbursed Burton & Meyer for its damages. Cincinnati assumed the risk of Burton & Meyer's economic loss when it provided Burton & Meyer with coverage. We decline to place "unbargained-for and unexpected risks" on the manufacturer where the insurer contracted to cover such risks. *See id.* at 410–11, 573 N.W.2d at 849. Thus, we reverse the judgment of the trial court and remand

this case with directions that the trial court enter summary judgment in favor of AM International.

*By the Court.*—Judgment reversed and cause remanded with directions.