Gerald GRAMS and Joliene Grams,
Plaintiffs-Appellants-Petitioners,

v.

MILK PRODUCTS, INCORPORATED,
Defendant-Respondent,

CARGILL, INCORPORATED, Defendant.

Supreme Court

*No. 2003AP801. Oral argument March 3, 2005.
—Decided July 8, 2005.*

2005 WI 112

(Also reported in 699 N.W.2d 167.)

For the plaintiffs-appellants-petitioners there were briefs by *Christopher J. Rogers* and *Rogers & Westrick,* Fort Atkinson, and *Brice A. Tondre,* Denver, CO, and oral argument by *Brice A. Tondre.*

For the defendant-respondent there was a brief by *Mark S. Henkel* and *First Law Group S.C.,* Stevens Point, and oral argument by *Mark S. Henkel.*

An amicus curiae brief was filed by *E. Campion Kersten* and *Kersten & McKinnon, S.C.,* Milwaukee, and *William C. Gleisner, III,* and *Law Offices of William Gleisner,* Milwaukee, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. DAVID T. PROSSER, J. Petitioners Gerald and Joliene Grams (the Grams) seek review of an unpublished court of appeals decision[1] affirming a grant of summary judgment to Milk Products, Inc. (Milk Products) by the circuit court for Rock County, John W. Roethe, Judge. The court of appeals affirmed the circuit

---

[1] *Grams v. Milk Prods., Inc.,* No. 2003AP801, unpublished slip op. (Wis. Ct. App. June 17, 2004).

court's determination that the economic loss doctrine barred the Grams' tort claims against Milk Products and Cargill, Inc. (Cargill).

¶ 2. The economic loss doctrine is a judicial doctrine intended to preserve the fundamental distinction between contract and tort. *Ins. Co. of N. Am. v. Cease Elec., Inc.*, 2004 WI 139, ¶ 15, 276 Wis. 2d 361, 688 N.W.2d 462. It works to prevent a party to a contract from employing tort remedies to compensate the party for purely economic losses arising from the contract. There are exceptions. For instance, we noted several years ago that "The economic loss doctrine does not preclude a product purchaser's claims of personal injury or *damage to property other than the product* itself." *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 247, 593 N.W.2d 445 (1999) (emphasis added). Over time, however, the parameters of this "other property" exception have proved elusive. In this case, we must decide whether the Grams' claimed damages fall within the scope of the "other property" exception.

¶ 3. We hold that if claimed damages are the result of disappointed expectations of a bargained-for product's performance, the economic loss doctrine applies to bar the plaintiff's tort claims and the plaintiff must rely upon contractual remedies alone. In this case, the Grams allege in tort that the object of the contract, a "milk replacer" intended for livestock nourishment, did not adequately nourish their calves and that some died. Because we find that this tort claim is, at bottom, based on disappointed performance expectations, we hold that it does not fit within the "other property" exception and is therefore barred by the economic loss doctrine. Accordingly, we affirm the decision of the court of appeals.

## I. FACTS AND PROCEDURAL POSTURE

¶ 4. Because this case is before us on the defendants' motion for summary judgment, we take the Grams' version of the facts as true.

¶ 5. Gerald and Joliene Grams have specialized in raising calves since 1992. The Grams acquire the calves when they are between three and five days old and raise them until they are approximately four months old, at which time they resell them. At the time of this dispute, the Grams were raising approximately 6000 calves each year.

¶ 6. For the first few weeks of their lives, the calves are fed a milk substitute which, in farming parlance, is called a "milk replacer." The Grams used a Cargill milk replacer known as "Half-Time." This product included medications designed to keep the calves healthy during the first few weeks of their lives, a critical time in which the calves' immune systems are developing. The "Half-Time" milk replacer was manufactured for Cargill by Milk Products, Inc.

¶ 7. In November 2000, the Grams asked a Cargill representative about obtaining a less expensive milk replacer. The representative told the Grams that they could purchase "Half-Time" milk replacer without medication at a lower price than the medicated version. The Grams began using this non-medicated version in January 2001. As with the medicated "Half-Time," the non-medicated version was sold by Cargill and manufactured by Milk Products.

¶ 8. Soon after they began using the non-medicated "Half-Time," the Grams noticed certain problems developing in their calves. Specifically, the calves were not gaining weight properly and appeared gaunt and hungry. In addition, the mortality rate of the calves

tripled, from an average of 9 percent before the new replacer was used to a high of 34 percent after the new replacer was introduced. By June 2001, after making several attempts to remedy these problems with Cargill and later with Milk Products, the Grams discontinued using the non-medicated "Half-Time." The Grams believed that poor nutritional content in the non-medicated replacer had damaged the calves' immune systems, which in turn caused the poor growth of the calves and their higher mortality rate.

¶ 9. The Grams filed suit against Cargill and Milk Products on October 22, 2001. They alleged five causes of action, one in contract and four in tort: (1) breach of implied warranty; (2) strict liability tort; (3) negligence; (4) intentional misrepresentation; and (5) strict responsibility misrepresentation. The Grams alleged all five causes of action "jointly and severally" against the two defendants.

¶ 10. The circuit court granted summary judgment to both Cargill and Milk Products on all four tort claims, finding that those claims were barred by the economic loss doctrine. The circuit court also granted summary judgment to Milk Products on the Grams' contract claim because there was no privity between the Grams and Milk Products, and it dismissed Milk Products from the case. This left only the Grams' contract claim against Cargill.

¶ 11. The Grams appealed, alleging that the circuit court erred in dismissing their contract claim against Milk Products as well as all their tort claims. The court of appeals affirmed on both issues. *Grams v. Milk Prods., Inc.*, No. 2003AP801, unpublished slip op. (Wis. Ct. App. June 17, 2004). We granted review to

determine whether the Grams' tort claims are barred by the economic loss doctrine.[2]

## II. STANDARD OF REVIEW

¶ 12. This court reviews motions for summary judgment de novo, using the same methodology as the circuit court. *Town of Delafield v. Winkelman*, 2004 WI 17, ¶ 15, 269 Wis. 2d 109, 675 N.W.2d 470. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2) (2001–02).[3] The interpretation of the economic loss doctrine is a question of law that this court reviews de novo. *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.*, 148 Wis. 2d 910, 915, 437 N.W.2d 213 (1989).

## III. ANALYSIS

A. The Economic Loss Doctrine

¶ 13. The economic loss doctrine is a judicially created doctrine intended to preserve the boundary between tort and contract. To illustrate, the commercial purchaser of a product may not recover from the manufacturer or seller, under negligence or strict liabil-

---

[2] The circuit court's dismissal of the Grams' contract claim against Milk Products is not before us.

[3] All subsequent references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

ity theories, for solely economic losses arising from that product. This is especially true when a warranty given by the manufacturer specifically precludes the recovery of such damages. *Van Lare v. Vogt, Inc.*, 2004 WI 110, ¶ 18, 274 Wis. 2d 631, 683 N.W.2d 46. In Wisconsin, the economic loss doctrine is based on three fundamental premises. It seeks "(1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk of economic loss, [that is,] the commercial purchaser, to assume, allocate, or insure against that risk." *Id.*, ¶ 17 (quoting *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 403, 573 N.W.2d 842 (1998)).

¶ 14. Tort law generally offers a "broader array" of damages than contract.[4] *Cease Elec.*, 276 Wis. 2d. 361, ¶ 24. As a result, many products liability plaintiffs would prefer to sue in tort. It has been said that without a boundary maintaining the distinction between the two, "contract law would drown in a sea of tort." *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 225 Wis. 2d 305, 320, 592 N.W.2d 201 (1999) (quoting *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866 (1986)).

¶ 15. Wisconsin has recognized the superior ability of contract law, and in particular the Uniform

---

[4] For example, punitive damages and attorney fees are sometimes available in tort actions, but generally cannot be had in breach of contract claims. Contracts give the parties an opportunity to limit the scope and amount of liability. Further, the nature of a claim, tort or contract, may affect whether a particular person or entity is eligible as a defendant and whether a particular claim is covered by insurance.

Commercial Code (UCC), to deal with certain kinds of disputes. *Cease Elec.,* 276 Wis. 2d 361, ¶ 33. In *Cease Electric,* however, we declined to apply the economic loss doctrine to contracts for services. *Id.,* ¶ 2. Central to our decision was the fact that no body of law similar to the UCC applies to contracts for services. We recognized that the UCC provides a "comprehensive system for compensating consumers for economic loss arising from the purchase of defective products." *Id.,* ¶ 28 (citing *State Farm,* 225 Wis. 2d at 342.) When a product proves to be defective, the UCC allows the aggrieved buyer to sue for breach of warranty or (under certain circumstances) to return the goods and sue for breach of contract. *Id.,* ¶ 29. *See also* Wis. Stat. §§ 402.313 (express warranties), 402.314, 402.315 (implied warranties), 402.602 (rejection), 402.608 (revoking acceptance).

¶ 16. Concern about duplicating or overriding UCC provisions was an important reason this court chose to adopt the economic loss doctrine in the first place. *Sunnyslope,* 148 Wis. 2d at 916. In that case, we refused to allow the plaintiff to circumvent a warranty through a tort claim, reasoning that the "protections granted by the [UCC] are not to be buttressed by tort principles and recovery." *Id.* (internal citations omitted).

¶ 17. In addition, contract law and tort law embody distinctly different approaches to risk sharing. The UCC provides a structure that encourages parties to a contract to allocate the economic risks of a given transaction between or among themselves. *Daanen & Janssen,* 216 Wis. 2d at 407. This is especially true when a manufacturer produces a part or component that can be used in a variety of ways. In that case, a

party down the supply chain—often the ultimate purchaser—may be best situated to assess the risk and guard against it by securing a warranty, buying insurance, or allocating risk in other ways. *Id.* at 411.

¶ 18. Tort law, unlike contract, does not permit risk sharing. It imposes obligations. Tort law is designed to "protect society against the unreasonable risk of harm from accidental and unexpected injury." *Cease Elec.*, 276 Wis. 2d 361, ¶ 39. When a product poses these types of risks to society, "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." *E. River,* 476 U.S. at 866 (internal citations omitted). When a manufacturer designs or produces a product that poses such a risk, responsibility for the resulting injuries will redound to the manufacturer.

¶ 19. This tort rationale breaks down when a loss is purely economic. When parties of roughly equal bargaining power allocate risks of loss through negotiation, society has no special interest in overturning that allocation. *Id.* at 873. If buyers could recover purely economic losses through tort suits, manufacturers could never rely on the risk allocations they negotiated through contract. Instead, end users could circumvent unfavorable warranties simply by suing a manufacturer up the production chain, or negotiate for no warranty at all and rely on tort law as their insurer. *Daanen & Janssen,* 216 Wis. 2d at 408. This would be contrary to the public policy embodied in the UCC, which lays out a carefully constructed framework of warranties to allow manufacturers to negotiate limits on their risk. *See id.* at 407–408 (citing Wis. Stat. § 402.719(3) (seller can limit consequential damages as long as the limitation is

not unconscionable)). Tort recovery for purely economic losses would also be contrary to sound economic policy. If a manufacturer must always insure its products against economic loss, all manufacturers will be transformed "into insurers with seemingly unlimited tort liability." *Id.* at 412. With no ability to share their risk with commercial users of the product, manufacturers would understandably be reluctant to produce certain products. *Id.* at 408. They also would be prevented from providing lower cost products to parties willing to assume the risk of certain losses.

¶ 20. The economic loss doctrine, therefore, differentiates between economic losses, for which risk sharing is encouraged, and other losses, such as personal injury losses, where risk sharing is undesirable as a matter of public policy.

B. The "Other Property" Exception to the Economic Loss Doctrine

¶ 21. The economic loss doctrine has been traced to a landmark decision by the California Supreme Court, *Seely v. White Motor Co.,* 403 P.2d 145 (Cal. 1965), involving a defective truck. The court allowed recovery for breach of an express warranty but refused to allow recovery on the basis of strict product liability. The court said that a manufacturer can be held liable for physical injuries caused by defects "by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." *Id.* at 151.

¶ 22. The law following *Seely* was summarized by Professor William K. Jones of Columbia University School of Law in 1990:

> If a product fails to function properly, the buyer usually incurs expenses in repairing or replacing the product. In addition, the buyer's business may be disrupted, resulting in lost profits. Such "economic losses" generally cannot be recovered in tort actions alleging negligence or strict product liability. If, however, the defect in the product causes *physical injury to property,* tort remedies are available. The distinction is easy to apply in some cases, but it poses severe difficulties in others.

William K. Jones, *Product Defects Causing Commercial Loss: The Ascendancy of Contract over Tort,* 44 U. Miami L. Rev. 731, 747–48 (1990) (emphasis added).

¶ 23. In the *East River* case, the Supreme Court embraced the economic loss doctrine but expanded it, indicating that physical damage to the product itself was covered by the doctrine. The Court stated:

> We realize that the damage [to the defective product] may be qualitative, occurring through gradual deterioration or internal breakage. Or it may be calamitous. But either way, since by definition no person or *other property* is damaged, the resulting loss is purely economic. Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law.

*Id.* at 870 (emphasis added).

¶ 24. This court has recognized the "other property" exception in Wisconsin. *Daanen & Janssen,* 216 Wis. 2d at 402 ("The economic loss doctrine . . . does not

bar a commercial purchaser's claims based on personal injury or damage to property other than the product, or economic loss claims that are alleged in combination with noneconomic losses.") (citing cases). It has also acknowledged, as Professor Jones did, that "distinguishing between economic loss and physical harm to property other than the product itself is often a difficult task . . . ." *Northridge Co. v. W.R. Grace & Co.,* 162 Wis. 2d 918, 932, 471 N.W.2d 179 (1991).

¶ 25. The economic loss doctrine has been approved in the majority of jurisdictions throughout the United States. Consequently, there is a substantial body of law showing how various states have defined and dealt with the "other property" exception. Minnesota presents an interesting case study. *See* Jacquelyn K. Brunmeier, *Death by Footnote: The Life and Times of Minnesota's Economic Loss Doctrine,* 19 Wm. Mitchell L. Rev. 871 (1993). Minnesota adopted the economic loss doctrine in 1981 in *Superwood Corp. v. Siempelkamp Corp.,* 311 N.W.2d 159 (Minn. 1981). The court stated: "[W]e hold that economic losses that arise out of commercial transactions, except those involving personal injury or *damage to other property,* are not recoverable under the tort theories of negligence or strict products liability." *Superwood,* 311 N.W.2d at 162 (emphasis added). Less than a decade later, however, the court overruled *Superwood,* concluding that the UCC exclusively controls claims alleging only property damage in a commercial transaction. *Hapka v. Paquin Farms,* 458 N.W.2d 683 (Minn. 1990). The case, which involved diseased seed potatoes, effectively eliminated the "other property" exception in Minnesota.[5]

---

[5] A struggle to define the scope of the doctrine ensued between the Minnesota Legislature and the Minnesota Su-

¶ 26. Two years later, when Michigan adopted the economic loss doctrine in *Neibarger v. Universal Coops, Inc.*, 486 N.W.2d 612 (Mich. 1992), the Michigan Supreme Court rejected the approach this court took in *Sunnyslope* and instead embraced Minnesota's approach in *Hapka*. The Michigan court stated: "Where damage to other property was caused by the failure of a product purchased for commercial purposes to perform as expected, and this damage was within the contemplation of the parties to the agreement, the occurrence of such damage could have been the subject of negotiations between the parties." *Neibarger,* 486 N.W.2d at 620. *See* Christian W. Fabian, Case Note, 70 U. Det. Mercy L. Rev. 513 (1993) (discussing *Neibarger*).

¶ 27. In this state, the evolution of the economic loss doctrine has been slower than in Minnesota and Michigan; our appellate decisions have repeatedly used techniques to limit the scope of the "other property" exception without eliminating it. Like many other states, we have incorporated the concept of an "integrated system." If the "product" at issue is a defective

preme Court. *See* Minn. Stat. § 604.10 (created by 1991 Minn. Laws c. 352) (statutorily reversing *Hapka v. Paquin Farms,* 458 N.W.2d 683 (Minn. 1990)); *Lloyd F. Smith Co. v. Den-Tal-Ez, Inc.,* 491 N.W.2d 11 (Minn. 1992) (discussing scope of economic loss doctrine and relying on *Hapka* rather than Minn. Stat. § 604.10); Minn. Stat. § 604.10 (as revised by 1993 Minn. Laws c. 91); Minn. Stat. § 604.101 (created by 2000 Minn. Laws c. 358) ("A buyer may not bring a product defect tort claim against a seller for compensatory damages unless a defect in the goods sold or leased caused harm to the buyer's tangible personal *property other than the goods* . . . .").

We cite *Hapka* merely as an example of the potentially broad scope of the economic loss doctrine.

component in a larger "system," the other components are not regarded as "other property" in a legal sense, even if they are different property in a literal sense.

¶ 28. This principle was stated in *Wausau Tile:* "Damage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property' which precludes the application of the economic loss doctrine." *Wausau Tile*, 226 Wis. 2d at 249.[6] Thus, a manufacturer of concrete pavers was not permitted to sue two of its suppliers *in tort* for supplying allegedly defective cement and aggregate. The cement and aggregate were deemed components of a more complete product, or "integrated system." The court explained that when harm results from a defective component of a product, the product itself is deemed to have caused the harm. *Id.* at 250 (citing *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 883 (1997)).[7]

¶ 29. The court of appeals applied the integrated system principle to building construction in *Bay Breeze Condominium Ass'n v. Norco Windows, Inc.*, 2002 WI App 205, 257 Wis. 2d 511, 651 N.W.2d 738, a case involving windows that were installed in a condominium complex. The condominium association sued the window manufacturer claiming numerous problems

---

[6] *See also E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 867–68 (1986); *Midwest Helicopters Airways, Inc. v. Sikorsky Aircraft*, 849 F. Supp. 666, 671–72 (E.D. Wis. 1994); *Cincinnati Ins. Co. v. Am. Int'l*, 224 Wis. 2d 456, 463, 591 N.W.2d 869 (Ct. App. 1999); *Midwhey Powder Co. v. Clayton Indus.*, 157 Wis. 2d 585, 590–91, 460 N.W.2d 426 (Ct. App. 1990).

[7] *See also Casa Clara Condominium Ass'n v. Charley Toppino & Sons, Inc.*, 620 So. 2d 1244, 1247 (Fla. 1993); *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 682 N.E.2d 45, 58 (Ill. 1997).

related to the windows including leakage into the units and walls around the windows and rotting and deterioration of wood window casements and frames. The circuit court dismissed the association's tort claims even though the association could prove damage to property other than the windows.

¶ 30. When the court of appeals affirmed, it acknowledged that the economic loss doctrine "does not apply . . . if the damage is to property other than the defective product itself." *Id.*, ¶ 13. However, the court concluded that the economic loss doctrine applies to building construction defects when the defective product is a component part of an integrated structure or finished product. "The law of *Casa Clara [Condominium Association v. Charley Toppino & Sons, Inc.,* 620 So. 2d 1244 (Fla. 1993)] is consistent with Wisconsin precedent addressing component parts that cause damage to an integrated product, which results in only economic loss." *Id.*, ¶ 26. "Because of the integral relationship between the windows, the casements and the surrounding walls, the windows are simply a part of a single system or structure, having no function apart from the buildings for which they were manufactured." *Bay Breeze,* 257 Wis. 2d 511, ¶ 27.

¶ 31. The "integrated system" concept does not translate well to all situations involving property damage to which the economic loss doctrine logically applies. To address situations in which a different explanation is needed for delimiting the other property exception, the court of appeals adopted the "disappointed expectations" concept which entails a different analysis. This concept governs situations in which a commercial product causes property damage but the damage was within the scope of bargaining, or as the Michigan Supreme Court reasoned, "the occurrence of

such damage could have been the subject of negotiations between the parties." *Neibarger,* 486 N.W.2d at 620.[8]

---

[8] Contrary to the dissent's assertion that we "fabricate" the disappointed expectations concept, Chief Justice Abrahamson's dissent, ¶ 62, the concept has existed for more than twenty years, and has been adopted by numerous other courts. As the United States District Court for South Carolina observed:

> [A] rule appears to be emerging that in a commercial transaction between two equal parties, loss to property belonging to the plaintiff flowing from a product . . . within the contract's contemplation and reasonably foreseeable as a result should the product . . . prove defective will not support recovery in tort because injury to such property is contemplated, or should have been, by the parties to the agreement. As a corollary therefore, the term "other property" appears to be subject to the construction that it is property belonging to the plaintiff the risk to which is outside the reasonable contemplation of the contract.

*Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.,* 843 F. Supp. 1027, 1060 (D.S.C. 1993); *see also Moorman Mfg. Co. v. Nat'l Tank Co.,* 435 N.E.2d 443, 451–52 (Ill. 1982); John J. Laubmeier, Comment, *Demystifying Wisconsin's Economic Loss Doctrine,* 2005 Wis. L. Rev. 225, 227 ("The idea behind the economic loss doctrine is that if someone purchases something that fails to meet his or her expectations, the purchaser's sole remedy should be the remedy bargained for by the parties, which was theoretically a factor taken into account in the purchase price."); Fox & Loftus, *Riding the Choppy Waters of East River: Economic Loss Doctrine Ten Years Later,* 64 Def. Couns. J. 260, 265–66 (1997).

Even in Wisconsin, the concept dates back to the late 1980s. In his petition for review in *Tony Spychalla Farms, Inc. v. Hopkins Agricultural Chemical Company,* 151 Wis. 2d 431, 444 N.W.2d 743 (Ct. App. 1989), Attorney Russell T. Golla asked this court to decline to apply the other property exception "if the . . . lost profits[] result from the plaintiff's failed expectations in purchasing the product." Attorney Golla cited the Third Circuit's decision in *King v. Hilton-Davis,* 855 F.2d 1047 (3d Cir. 1988) (*cert. denied,* 488 U.S. 1030 (Jan. 17, 1989)). In *King,* the Third Circuit barred a tort claim nearly identical to the one made in *Spychalla* on the

¶ 32. The "disappointed expectations" concept is grounded in contract principles of bargaining and risk sharing, not on a redefinition of "other property." The determination of whether particular damage qualifies as damage to "other property" turns on the parties' expectations of the function of the bargained-for product. *See Rich Prods. Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 972 (E.D. Wis. 1999) (citing *Dakota Gasification Co. v. Pascoe Bldg. Sys.*, 91 F.3d 1094 (8th Cir. 1996)).

¶ 33. The "disappointed expectations" concept is illustrated in two cases from the court of appeals. In *D'Huyvetter v. A.O. Smith Harvestore Products*, 164 Wis. 2d 306, 317, 475 N.W.2d 587 (Ct. App. 1990), the plaintiff purchased a "Harvestore" grain silo system from the defendant. According to D'Huyvetter, the silo failed to operate properly because it did not protect the integrity of the stored feed. The compromised feed caused damage to D'Huyvetter's livestock including reduced milk production, loss of profits from sale of cattle, and the death and illness of some of the livestock. *Id.* at 326.

¶ 34. The court of appeals held that the damage to D'Huyvetter's livestock did not come within the "other property" exception to the economic loss doctrine. The court reasoned that "[t]he expected function of the Harvestore was to enrich the feed, providing enhanced nutrition for the cows. The damages stem from the failure of the Harvestore to perform 'as expected.' " *Id.* at 328.[9]

---

grounds that "The Kings lost the expected performance of the seed potatoes, no more and no less." *King*, 855 F.2d at 1052.

[9] *See also Agristor Leasing v. Guggisberg*, 617 F. Supp. 902, 908 (D. Minn. 1985) ("[We] conclude [ ] as a matter of law that the alleged damage to the alfalfa feed and the Holstein cows is

¶ 35. The court of appeals applied a similar "disappointed expectations" test in *Selzer v. Brunsell Brothers, Ltd.*, 2002 WI App 232, 257 Wis. 2d 809, 652 N.W.2d 806. In *Selzer*, the plaintiff bought windows that the defendant warranted to be "deep-treated to permanently protect against rot and decay." *Id.*, ¶ 5. Seven years after the windows were installed, the plaintiff noticed that the windows were rotting, and that the rot had spread to the siding around the windows. *Id.*, ¶ 6. Selzer argued that the rot in the siding was damage to "other property" and thus the economic loss doctrine would not bar his tort claim.

¶ 36. The court of appeals disagreed. It observed that this was a loss that "at bottom, [involved] disappointed performance expectations." *Id.*, ¶ 36. Selzer bought the windows expecting that they would resist rot. They failed to do so. The court reasoned that the rot in the surrounding wood was a direct consequence of the rot in the windows themselves. *Id.*, ¶ 37. The collateral rot was part of Selzer's disappointed expectations. The court said that because Selzer did not prove any harm beyond disappointed expectations, he was precluded from pursuing a recovery in tort. The court added: "Had the windows resisted rot but spontaneously shattered, spewing shards of glass into an adjacent Picasso, Selzer might well argue that the defective windows damaged his painting in an entirely unanticipated manner, going well beyond a failure to perform as expected and entitling him to pursue a tort remedy." *Id.*

non-recoverable economic loss. The Harvestore structure . . . was purchased for the purpose of storing feed for the Guggisbergs' dairy operation, a commercial venture. The essence of their complaint is that the Harvestore failed to perform as expected . . . ").

¶ 37. The court's picturesque hypothetical was designed to show the corollary of the disappointed expectations concept, namely, a situation in which the damage to "other property" and the risk of that damage was entirely unanticipated.

¶ 38. The 1989 case of *Tony Spychalla Farms, Inc. v. Hopkins Agricultural Chemical Company,* 151 Wis. 2d 431, 444 N.W.2d 743 (Ct. App. 1989), is often cited as the prime example of the corollary principle . . . the "flip side" of *D'Huyvetter. See Rich Prods.,* 66 F. Supp. 2d at 975. In *Spychalla,* the plaintiff treated his potato seed with a chemical dust designed to prevent rot. The chemical correctly performed that function, but it also petrified Spychalla's seed, resulting in a significantly reduced crop. 151 Wis. 2d at 435. Spychalla filed suit against the manufacturer of the chemical dust under a theory of strict liability tort, alleging that the chemical was unreasonably dangerous to the seed. *Id.* The jury found for Spychalla on his tort claim and awarded him more than $225,000 in damages. *Spychalla,* 151 Wis. 2d at 434.

¶ 39. The court of appeals affirmed, concluding that the economic loss doctrine did not bar the plaintiff's tort claim. The court asserted that the chemical dust that Spychalla purchased was a dangerous product. Spychalla had expected the chemical to protect his crop by preventing rot, and it had done its work in that regard. *Id.* at 438. However, it inflicted damage in an unanticipated manner. This unanticipated damage to "other property," *id.* at 439, was deemed outside the economic loss doctrine.

¶ 40. Accepting the facts in *Spychalla* as reported, the court's decision is not wholly incompatible with the economic loss doctrine. Nonetheless, it must be remembered that the trial in that case occurred on June 15,

1987, almost two years before Wisconsin formally adopted the economic loss doctrine. There is a chance that a similar case would be decided differently today, realizing that a similar transaction would be subject to the UCC, and that it would not be unreasonable for the parties to anticipate a risk that the chemical dust could damage potato seed. In a new case, the result could turn on the purpose for purchasing the product, the reasonableness of anticipating a risk of the product's failed performance, the availability of warranties or risk sharing mechanisms, and the extremity of the facts.

¶ 41. In *Seely*, 40 years ago, the California court said that a defendant "cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." *Seely*, 403 P.2d at 151. "Level of performance" should now be understood to include failed performance. Today in a commercial setting, a sophisticated buyer must anticipate the risk that a purchased product will disappoint in its performance or fail entirely, and protect himself accordingly against economic loss.

■

¶ 42. The test adopted in *Selzer*—whether at bottom, the claim involves disappointed performance expectations—is an appropriate analytic tool to determine whether the other property exception applies. *Selzer*, 257 Wis. 2d 809, ¶ 36. This test certainly includes consideration of the purpose or thrust of the bargain and the contractual expectations of the parties.

■

¶ 43. In exploring the parameters of the "other property" exception to the economic loss doctrine, we will incorporate this concept of "disappointed expectations" into our analysis, as well as the integrated system

concept. This does not mean that contract principles will envelop all damages foreseeable "in a remote or general sense." *Rich Prods.*, 66 F. Supp. 2d at 975. Rather, the economic loss doctrine will apply when "prevention of the subject risk was one of the contractual expectations motivating the purchase of the defective product." *Id.*

¶ 44. The Grams urge this court to resolve the "other property" conundrum by adopting a new "bright line rule," that physical damage to anything other than the product itself would be considered damage to "other property" and therefore subject to suit in tort, and this argument attracts the dissent. *See* Chief Justice Abrahamson's dissent, ¶¶ 74, 80. The Grams concede that this proposal would obliterate the distinction between literal "other property" and legal "other property" discussed in the case law. Suits in tort would be allowed whenever damage extends beyond the physical dimensions of the purchased product. If such a rule were applied to this case, the Grams' tort claims could proceed because the calves were property different from the replacer.

¶ 45. We decline to adopt such a rule. The proposed rule would reject inquiry into the scope of the bargain and replace it with an overly formalistic distinction based on the kind of property harmed. Such a distinction would inevitably cause the erosion of the UCC. The "fundamental distinction" between contract and tort espoused in our cases would be lost.[10]

---

[10] The dissent relies heavily on *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875 (1997), but that case is distinguishable. In *Saratoga,* products added to a ship after it was manufactured (e.g. a skiff, a net, and communications and navigational electronics) were destroyed along with the ship when the ship's hydraulic system failed. A divided Court held

¶ 46. Under the UCC, product warranties are important and necessary vehicles for limiting a manufacturer's liability for risks associated with the possible *uses* of a product, not just diminution in value of the product itself. When a product is intended to be used as part of an integrated system, the integrated system rule allows the manufacturer to share the risk that its product will damage the rest of the system. *See Wausau Tile,* 226 Wis. 2d at 258–59. In adopting the integrated system concept, we recognized that "[s]ince all but the very simplest of machines have component parts, a holding that a component of a machine was 'other property' would require a finding of 'property damage' in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability." *Id.* at 250 (quoting *Saratoga Fishing Co.,* 520 U.S. at 883).

¶ 47. The same rationale applies here. If a product is expected and intended to interact with other products and property, it naturally follows that the product could adversely affect and even damage that property. A rule that allows tort recovery based on what is damaged, rather than whether the risk of that damage was within the scope of the bargain, would leave little room for contract.

¶ 48. Accordingly, we decline to adopt the Grams' proposed rule, and proceed to the facts of this case using the disappointed expectations test.

---

that the added products were "other property" and that the loss of the "other property" could be sued for in tort. That is simply a different case. The Grams bargained for a non-medicated milk replacer, paid a lower price for it, and should not have been surprised that it did not perform as well as the more expensive medicated product.

## IV. APPLICATION

¶ 49. The Grams claim that the non-medicated milk replacer they bought from Cargill damaged their calves' immune systems, leading to poor growth and higher mortality. Consistent with the foregoing analysis, we ask whether, at bottom, this claim involves disappointment in the milk replacer's performance and failure of the product to fulfill the Grams' contractual expectations.

¶ 50. The first step in our inquiry is to determine what those expectations were. This necessitates an inquiry into the substance and the purpose of the transaction. The record shows that the expected function of the milk replacer was to provide sustenance for the Grams' calves. The Grams expected that the "Half-Time" non-medicated replacer would properly nourish the calves, much as the old replacer had, so that the calves would grow. This bargain was not about milk replacer per se; it was about a product that would foster the healthy development and growth of young calves.

¶ 51. The next step is to inquire whether the Grams' claim is about disappointment with those expectations. In this case, the milk replacer did not properly nourish the calves. Poor nourishment led to a number of consequences for the calves, including weakened immune systems and for some, even death. The replacer did not do what the parties expected it to do, and this caused the exact result the Grams sought to avoid. It is difficult to think of a better example of disappointed expectations than a product that is expected to nourish animals but leaves them malnourished. The Grams' expectations were disappointed; the fact that they were severely disappointed does not change the analysis.

¶ 52. The Grams argue that this case is like *Spychalla;* that the damage caused by the replacer was worse than failed expectations. The replacer not only stunted the calves' growth, it killed some of them. The Grams argue that when the replacer killed some of the calves, the result was entirely unanticipated, similar to the petrification of the seed in *Spychalla.*

¶ 53. This argument ignores the intertwined nature of calf health, nutrition, and mortality. The Grams bargained for a replacer that would nourish the calves and make them grow. Even with high quality medicated milk replacer, the mortality rate of the Grams' calves ran about 9 percent. A reasonable farmer would know that switching to an unmedicated milk replacer could cause some increase in calf mortality. The only question was how much. Obviously, the Grams expected a lower increase in calf mortality than actually occurred, but that does not change the fact that the calves' nutrition —or, unfortunately, malnutrition—was at the heart of the bargain the Grams made. We think this is consistent with the teaching of *Spychalla.*

¶ 54. We acknowledge that determining whether a case is one of disappointed performance expectations will not always be as simple as it is here. It will necessarily require interpretation of the purpose of a transaction and the expected uses of a product. While courts undertaking this inquiry should be mindful to prevent "contract from drowning in a sea of tort," they should also prevent tort from drowning in a sea of contract.[11] *See* R. Thomas Cane & Sheila Sullivan, *The future of the economic loss doctrine in Wisconsin,* Wis-

[11] The dissent's conclusions that the economic loss doctrine would bar certain hypothetical tort claims, or that it "threatens the strict products liability doctrine," *see* Chief Justice

consin Lawyer, May 2005, at 14. We believe the disappointed expectations concept will prove useful in striking an appropriate balance.

## V. CONCLUSION

¶ 55. The Grams have a contractually rooted claim against Cargill for breach of implied warranty that remains to be resolved at the circuit court.[12] Because their tort claims are, at bottom, based on their disappointment with the performance of the non-medicated milk replacer, their contract claim is the proper vehicle for resolving this dispute. We therefore affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 56. ANN WALSH BRADLEY, J., withdrew from participation.

---

Abrahamson's dissent, ¶¶ 63, 76–79, give the doctrine a far more expansive reading than is warranted by this opinion.

[12] Both of the Grams alleged that a Cargill representative told them to "compute our losses, submit them to Cargill and Cargill would take care of us." On remand, the Grams will have a chance to pursue such contractual remedies.

The dissent laments the fact that "[the Grams] cannot sue Milk Products at all." Chief Justice Abrahamson's dissent, ¶ 64. The dissent gives no reason, however, that the Grams cannot be fully compensated through their contract claim against Cargill. In turn, Cargill may choose to sue Milk Products. Thus, the Grams are not prevented from recovery and Milk Products is not protected from liability. The Grams are prevented, however, from making an "end run" around their contract with Cargill. This is exactly the purpose for which the economic loss doctrine was designed. *See Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis. 2d 395, 407, 573 N.W.2d 842 (1998).

¶ 57. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). "[T]he most quickly and confoundingly expanding legal doctrine is ... the economic loss rule."[1] Like the ever-expanding, all-consuming alien life form portrayed in the 1958 B-movie classic *The Blob,* the economic loss doctrine seems to be a swelling globule on the legal landscape of this state. According to one commentator, the economic loss doctrine has been an issue in the Wisconsin court of appeals and supreme court 47 times during 2000–2004.[2] At the current pace, the economic loss doctrine may consume much of tort law if left unchecked.[3]

¶ 58. Courtesy of this majority opinion and other opinions of this court, this legal doctrine with modest, or even "obscure"[4] beginnings, is fast growing.[5] Taking a further step in increasing the scope of the economic loss doctrine, the majority in the instant case delivers a

---

[1] Paul J. Schwiep, *The Economic Loss Rule Outbreak: The Monster That Ate Commercial Torts,* Fla. B.J., Nov. 1995, at 34.

[2] John J. Laubmeier, Comment, *Demystifying Wisconsin's Economic Loss Doctrine,* 2005 Wis. L. Rev. 225, 225 n.3.

[3] *See* Schwiep, *supra* note 1, at 40 ("[W]hat is needed is critical analysis of the rule's place and application, rather than the trivial invocation of the rule to stem the tide of commercial tort litigation, in an apparent attempt at judicial tort reform.").

[4] Laubmeier, *supra* note 2, at 225.

[5] The economic loss doctrine can be traced to the California Supreme Court's reasoning in *Seely v. White Motor Co.,* 403 P.2d 145 (Cal. 1965). The United States Supreme Court adopted the California court's reasoning in *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 871 (1986), and this court adopted the *East River* reasoning in *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.,* 148 Wis. 2d 910, 437 N.W.2d 213 (1989), expressly limiting tort liability for defective products to injury caused to persons or damage caused to property other than the defective product itself.

significant blow to the vitality of the "other property" exception to the economic loss doctrine.

¶ 59. The economic loss doctrine bars recovery in tort for economic damage "to a product itself or monetary loss caused by the defective product, which does not cause personal injury or damage to other property."[6] Although simple to state, the doctrine's meaning and application are confounding litigants, their lawyers, and the courts.[7]

¶ 60. It is the "other property" exception to the economic loss doctrine that is at issue in the instant case. " '[O]ther property' is a legal term of art."[8]

¶ 61. The majority opinion takes two actions with respect to the "other property" exception. First, it reaffirms this court's endorsement and use of the "integrated system" concept when evaluating whether a

---

[6] *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 247, 593 N.W.2d 445 (1999) (quoted source omitted).

Restatement (Third) of Torts § 21 (1998) provides as follows:

> Sec. 21. For purposes of this Restatement, harm to persons or property includes economic loss if caused by harm to:
>
> (a) the plaintiff's person;
>
> (b) the person of another when harm to the other interferes with a legally protected interest of the plaintiff protected by tort law; or
>
> (c) the plaintiff's property other than the defective product itself.

[7] "The economic loss rule has become a confusing morass." *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 544 (Fla. 2004) (Cantero, J., concurring).

[8] *Fireman's Fund McGee Marine Underwriters v. A & B Welding & Mfg., Inc.*, 2005 WL 568055, at *3 (W.D. Wis. Mar. 8, 2005).

claimed loss is damage to "other property."[9] This proposition is not controversial; the court unanimously adopted this concept. In *Wausau Tile, Inc. v. County Concrete Corp.*[10] we said that "[d]amage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property' which precludes the application of the economic loss doctrine."[11]

¶ 62. Second, because "[t]he 'integrated system' concept does not translate well to all situations involving property damage to which the economic loss doctrine logically applies,"[12] the majority has to fabricate another theory for broadening the definition of "other property" to fit the present case. The majority joins other courts in adopting "reasonable foreseeability,"[13] a fundamental principle of contract damages, and adapting it as the "disappointed expectations" rule to define "other property" in economic loss cases.[14]

¶ 63. I dissent for three reasons: (1) the policies motivating the creation of the economic loss doctrine are not furthered by dismissing the Grams' tort action against Milk Products (the manufacturer of milk replacer that killed and injured their calves), with whom the Grams have no contractual relationship; (2) the

---

[9] Majority op., ¶ 28.

[10] *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 249, 593 N.W.2d 445 (1999).

[11] *Wausau Tile,* 226 Wis. 2d at 249 (citing *E. River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 867–68 (1986) and other cases).

[12] Majority op., ¶ 31.

[13] *See Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145 (1854).

[14] Majority op., ¶ 43.

majority opinion's use of the "disappointed expectations" concept to define "other property" is so broad that the economic loss doctrine threatens the strict products liability doctrine; and (3) even under the majority opinion's standard for "other property," summary judgment was inappropriate in the instant case.

## I

¶ 64. The majority opinion bars the Grams from suing Milk Products either in contract or in tort. Milk Products sold the milk replacer to Cargill, which sold the product to the Grams. The Grams and Milk Products have no contractual relationship, and the Grams did not object to the dismissal of the contract action. Therefore, if the Grams cannot bring a tort suit against Milk Products, they cannot sue Milk Products at all. Allowing the Grams to sue Milk Products is not an "end run" around the contract, but rather would allow them to assert an action for a distinct legal wrong against the tortfeasor, Milk Products.

¶ 65. The Grams' tort action against Milk Products is, in my opinion, analogous to the tort action in the *Linden v. Cascade Stone Co.* case against the subcontractor.[15] In *Linden,* the court expanded the economic loss doctrine to bar a homeowner from suing a subcontractor for defective work, even though the homeowner had no contract with the subcontractor.

¶ 66. As Justice Bradley explained in her dissent in *Linden,* the economic loss doctrine is a judicially created doctrine whose existence is premised upon three oft-repeated justifications: "(1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to

---

[15] *Linden v. Cascade Stone Co.,* 2005 WI 113, 283 Wis. 2d 606, 699 N.W.2d 189.

allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk of economic loss, the commercial purchaser, to assume, allocate, or insure against that risk."[16]

¶ 67. In the instant case, as in *Linden,* the doctrine's policies are not furthered by application of the economic loss doctrine to deny an innocent purchaser a cause of action against the defendant-manufacturer who knew or should have known the purchaser's property would be injured by the defendant-manufacturer's tortious conduct.[17]

## II

¶ 68. The economic loss doctrine is of recent origin. The scope of the doctrine is still evolving. "[B]e-

---

[16] *Linden,* 283 Wis. 2d 606, ¶ 40 (Bradley, J., dissenting) (quoting *Ins. Co. of N. Am. v. Cease Elec.,* 2004 WI 139, ¶ 38, 276 Wis. 2d 361, 688 N.W.2d 462). *See also Van Lare v. Vogt, Inc.,* 2004 WI 110, ¶ 17, 274 Wis. 2d 631, 683 N.W.2d 46.

[17] Damages available against Cargill under contract law are not necessarily the same as damages recoverable against Milk Products under tort law. Restatement (Second) of Contract § 351 cmt a. at 136 (1979). Damages for breach of warranty against Cargill are covered by Wis. Stat. § 402.714, relating to accepted goods, and § 402.715(2)(b), relating to consequential damages available for any "[i]njury to person or property proximately resulting from any breach of warranty."

We do not know the scope of the damages for which Cargill may be liable because Cargill is not a party and the contract action is not before us. There may also be contractual limitations on the Grams' right to recover against Cargill. As the majority notes, "Contracts give the parties an opportunity to limit the scope and amount of liability." Majority op., ¶ 14 n.3. The majority cannot know, *see* majority op., ¶ 55 n.12, before proceedings against Cargill are completed whether the Grams will be compensated fully in contract for the allegedly defective product.

cause there has been much confusion about the scope of this doctrine, it is important to review its legal underpinnings."[18]

¶ 69. For commercial parties in contractual privity, the economic loss doctrine's disallowing tort damages for purely economic loss (except injury to person or other property) protects the integrity of the contract. We have permitted a tort action in privity of contract situations, however, for certain frauds.[19]

¶ 70. For those not in contractual privity, strict products liability allows a purchaser to sue a manufacturer for physical injury to person or property as a result of the defective product. The strict products liability doctrine was designed to govern the problem of physical injuries to person or property caused by defective products. The economic loss doctrine was developed for a different purpose, namely, to protect manufacturers from liability for "economic loss," that is, non-physical injury to person or property caused by a defective product beyond those damages compensated through the law of warranties. The purpose of the economic loss doctrine in the product liability arena is to protect the manufacturer from liability for losses to subsequent purchasers resulting from the failure of its product to perform according to the warranty.[20] Warranty law thus prevents liability of unknown and unlimited scope.[21]

---

[18] *Indemnity Ins. Co. of N. Am. v. Am. Aviation, Inc.,* 891 So. 2d 532, 536 (Fla. 2004).

[19] *See Kaloti Enters. v. Kellogg Sales Co.,* 2005 WI 111, 283 Wis. 2d 555, 699 N.W.2d 205.

[20] *Seely v. White Motor Co.,* 403 P.2d 145, 150 (Cal. 1965).

[21] *Seely,* 403 P.2d at 150.

¶ 71. What constitutes economic loss is not self-evident, because " '[e]conomic loss' is not a self-defining term, and it does not literally mean all monetary losses."[22] In *Northridge Co. v. W.R. Grace & Co.*[23] our court explained the distinction between economic loss (to be recovered in a contract action) and physical harm to property (to be recovered in a tort action) as follows:

> The plaintiffs' strict products liability claim is not barred, however, simply because the plaintiffs seek damages for repair costs, replacement costs, decreased value, and lost profits in the sale of the centers. While economic loss is measured by repair costs, replacement costs, loss of profits, or diminution of value, the measure of damages does not determine whether the complaint is for physical harm [to property] or economic loss. *City of Manchester v. National Gypsum Co.*, 637 F. Supp. 646, 651 (D.R.I. 1986). In other words, the fact that the measure of the plaintiffs' damages is economic does not transform the nature of its injury [to property] into a solely economic loss. *Town of Hooksett School Dt. v. W.R. Grace & Co.*, 617 F. Supp. 126, 131 (D.N.H. 1984).[24]

¶ 72. "Economic loss" has been described as that loss "resulting from the failure of the product to perform to the level expected by the buyer and commonly has been measured by the cost of repairing or replacing *the product* and the consequent loss of profits, or by the diminution in value *of the product* because it does not

---

[22] *Fireman's Fund McGee Marine Underwriters v. A & B Welding & Mfg., Inc.*, 2005 WL 568055, at *3 (W.D. Wis. March 8, 2005).

[23] *Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 471 N.W.2d 179 (1991).

[24] *Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 931–32, 471 N.W.2d 179 (1991).

work for the general purposes for which it was manufactured and sold."[25]

¶ 73. Here the Grams alleged that the product, the milk replacer, was defective in that it did not contain the nutritional value expected. The Grams expected the non-medicated milk replacer to provide nutrition for the calves. The Grams claim they were told that there was no significant difference between the two milk replacers other than medication. The feed did not live up to expectations. The defective feed resulted in the calves not gaining sufficient weight and in a large number of calves dying. We know that the lack of medication was not the cause of the deaths because the calves ceased to die when the Grams substituted real, non-medicated milk for the non-medicated milk replacer.

¶ 74. The damages the Grams seek in the instant case are measured in terms of money, but they are not the costs of replacing or repairing the milk replacer or the diminution in the value of the product. Certainly, the Grams' contract claim for breach of implied warranty is premised on the notion that the non-medicated milk replacer disappointed their expectations. However, the tort claims (strict liability, negligence, and intentional misrepresentation) allege that the milk replacer caused tangible physical injury to property. "[C]laims which allege economic loss in combination with non-economic loss are not barred by the [economic loss] doctrine."[26]

---

[25] *Agristor Leasing v. Guggisberg,* 617 F. Supp. 902, 907–08 (D. Minn. 1985) (emphasis added) (quoting *Minneapolis Soc'y of Fine Arts v. Parker-Klein Assocs. Architects,* 354 N.W.2d 816, 820–21 (Minn. 1984) (*overruled by Hapka v. Paquin Farms,* 458 N.W.2d 683 (Minn. 1990))).

[26] *Wausau Tile,* 226 Wis. 2d at 247.

¶ 75. The question the majority opinion presents is whether dead calves are "disappointed expectations" or are "other property" that has been damaged. The majority opinion treats the two as mutually exclusive, concludes that the dead calves are "disappointed expectations," and holds for the defendant. The majority's interpretation of the "other property" exception is so narrow that it is unworkable; almost nothing will qualify for the exception. If applied literally, the majority's articulation of the "other property" exception might completely eliminate the exception to the economic loss doctrine.

¶ 76. To my mind, "disappointed expectations" and "other property" are not mutually exclusive principles. Take, for example, a car dealer's defective car that spontaneously lurches backwards even though the motor has been properly turned off. The defective car driving in reverse destroys the garage door. Since the expectation is that the car will operate only when engaged, will not be self-operating in reverse, and will not spontaneously destroy anything behind it, the majority opinion's disappointed expectations rule would, if applied literally, bar recovery in tort for damage to the garage door.

¶ 77. Or, for example, a real estate developer buys a house from a builder for resale. The developer keeps the house for a period. The house as built has a garage that is equipped with an automatic garage door opener. One day the garage door closes, without prompting, onto the front of the developer's jeep, destroying the jeep. The occupants of the jeep are not injured. Applying literally the "disappointed expectations" standard announced by the majority opinion in the instant case, the developer would not be able to sue the garage door opener manufacturer because the garage door opener

547

merely failed to perform as expected. According to the majority opinion: " 'Level of performance' should now be understood to include failed performance,"[27] regardless of the harm done to "other property."

¶ 78. Despite the purchaser's "disappointed expectations" with the car that goes in reverse and the garage door that slams shut, I am confident that the majority would hold that the trailer and the jeep are "other property" and the manufacturer is liable under strict products liability.[28]

¶ 79. Even assuming that "disappointed expectations" might entail the calves' malnourishment, disappointed expectations cannot include the death of the calves at triple the normal rate any more than it is simply "disappointed expectations" when a pet dog dies as a result of eating dog food that is not as nutritious or as fat-free as advertised. To say dead animals are disappointed expectations suggests that there is no harm to person or property that would not qualify as disappointed expectations. Anytime a defective product fails and then injures someone or something, its owner is obviously disappointed with that product's performance.

¶ 80. Both disappointed expectations and "other property" coexist in these examples and in the instant case. Which of the two should be the governing principle? As I see it, a defendant is liable when he or she places in commerce a defective product that creates an unreasonable risk of injury to property other than the product sold and that injury occurs. The purchaser should not bear this risk of injury. The Grams should

---

[27] Majority op., ¶ 41.

[28] "Such damage [to other property] is considered so akin to personal injury that the two are treated alike." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 867 (1986).

have an opportunity to prove that the milk replacer was a defective product that created an unreasonable risk of injury to the calves and that injury occurred.

¶ 81. The California Supreme Court explained the principle governing damage to other property as follows:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. *The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm.* He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. *A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.* Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.[29]

¶ 82. The U.S. Supreme Court most recently addressed the issue of "other property" in 1997 in *Saratoga Fishing Co. v. J.M. Martinac & Co.*[30] In *Saratoga Fishing,* J.M. Martinac & Co. manufactured a

---

[29] *Seely,* 403 P.2d at 151 (emphasis added).

[30] *Saratoga Fishing Co. v. J.M. Martinac & Co.,* 520 U.S. 875 (1997).

ship and sold it new to Joseph Madruga.[31] Madruga, in turn, added equipment such as netting, a skiff, and other parts so that the ship could be used to fish for tuna.[32] A few years later Madruga sold the ship to Saratoga Fishing. Thirteen years of tuna fishing later, the ship caught fire as a result of a defectively designed hydraulic system that was part of the ship as originally built by J.M. Martinac. Saratoga sued J.M. Martinac in tort for damage to the parts and equipment added by Madruga.

¶ 83. In reversing the Ninth Circuit Court of Appeals, the United States Supreme Court held that the ship was the "product itself" and that all the items added to the ship by Madruga were "other property." Accordingly, ruled the U.S. Supreme Court, Saratoga's tort suit could proceed against the original manufacturer, J.M. Martinac.

¶ 84. *Saratoga Fishing* presents a striking contrast to the majority opinion in the instant case. In rebuking the Ninth Circuit for "creat[ing] a tort damage immunity beyond that set by any relevant tort precedent . . . ," the Court cited approvingly three cases in which courts determined the harmed objects were "other property"[33] and that therefore remedy could be had in tort.

¶ 85. In one case cited, *A.J. Decoster Co. v. Westinghouse Electric Corp.,*[34] the Maryland high court found that 140,000 chickens killed when a ventilation system for the chicken house malfunctioned were

---

[31] *Id.* at 877.

[32] *Id.*

[33] *Id.* at 880–81.

[34] *A.J. Decoster Co. v. Westinghouse Elec. Corp.,* 634 A.2d 1330 (Md. 1994).

"other property." The second case the Court cited was *United Air Lines, Inc. v. CEI Industries of Illinois, Inc.,*[35] in which "[a] warehouse owner recovered for damage to a building caused by a defective roof."[36] Finally, the Court cited a case similar to *Saratoga Fishing* in which damage to added seismic equipment on a ship resulting from an engine fire was actionable in tort.[37]

¶ 86. The Court emphasized that "[o]ne important purpose of defective-product tort law is to encourage the manufacture of safer products."[38] The manufacturer should not be immunized from liability for foreseeable physical damage.[39] To allow the ship's manufacturer to escape liability in *Saratoga Fishing,* the Court asserted, defied "the ordinary rules governing the manufacturer's tort liability."[40]

¶ 87. The Court did note that the intermediate seller could have included a warranty, but "[n]o court has thought that the mere possibility of such a contract term precluded tort recovery for damage to [a purchaser's] other property."[41]

¶ 88. The U.S. Supreme Court went on to reject the argument that contract law, if warranties were available, should supplant tort law. The Court wrote that "respondents have not explained why the ordinary

---

[35] *United Air Lines, Inc. v. CEI Indus. of Ill., Inc.,* 499 N.E.2d 558 (Ill. Ct. App. 1986).

[36] *Saratoga Fishing,* 520 U.S. at 880.

[37] *Nicor Supply Ships Assocs. v. Gen. Motors Corp.,* 876 F.2d 501 (5th Cir. 1989).

[38] *Saratoga Fishing,* 520 U.S. at 881.

[39] *Id.*

[40] *Id.* at 882–83.

[41] *Id.* at 882.

rules governing the manufacturer's tort liability should be supplanted merely because the [intermediate seller] may in theory incur an overlapping liability in contract."[42]

¶ 89. Finally, the Court also rejected the argument that manufacturers and distributors would be besieged with tort liability. The Court explained that there are "a host of other tort principles, such as foreseeability, proximate cause, and the 'economic loss' doctrine" that already substantially limit tort liability.[43]

¶ 90. In contrast with *Saratoga Fishing,* under the majority opinion's standard in the instant case, tort suits in all three of the cited cases would be barred by the economic loss doctrine if "other property" were redefined as being everything resulting from "disappointed expectations." The damage in all three cases was easily within the purchasers' "disappointed expectations."

¶ 91. Because I would follow the rule set forth in the *Saratoga Fishing* case, the cases cited therein, and *Wausau Tile,* I do not join the majority opinion.

### III

¶ 92. The facts of this case lead me to conclude that under the majority's new rule, summary judgment was improperly granted here. The majority opinion acknowledges that determining whether a case is one of disappointed performance expectations is not easy.[44]

¶ 93. This case reaches us because the circuit court granted summary judgment in favor of Milk

---

[42] *Id.* at 882–83.

[43] *Id.* at 884.

[44] Majority op., ¶ 54.

Products.[45] Summary judgment is properly granted when there are no issues of material fact, only questions of law upon which the moving party is entitled to judgment.[46]

¶ 94. The majority opinion candidly admits that the application of its newly adopted "within-the-contemplation-of-the-parties" standard, that is, the disappointed performance expectations standard, is fact-intensive: "[Application of the rule] will necessarily require the interpretation of the purpose of [the] transaction and the expected uses of [the] product."[47] In short, the court must know what the parties' expectations were in order to apply the doctrine correctly. If the majority really means what it says, summary judgment was inappropriate in this case.

¶ 95. Taking the facts in the light most favorable to the Grams, as we must, we know from the record that the Grams expected to get a milk replacer of the same nutritional quality as the one they had successfully used for three years, but non-medicated. We know from Mr. Grams' affidavit that a representative from Cargill told him that Half-Time non-medicated milk replacer had the same nutritional value as the milk replacer the Grams had bought from Cargill for years. The Grams did not expect the mortality rate of their calves to triple. They did not expect their calves to become undernourished on a milk replacer affirmatively represented as being of the same nutritional quality as a product with which they were familiar and had used with success.[48]

---

[45] Majority op., ¶ 1.

[46] *Badger State Bank v. Taylor,* 2004 WI 128, ¶ 12, 276 Wis. 2d 312, 688 N.W.2d 439.

[47] Majority op., ¶ 54.

[48] *See* majority op., ¶¶ 50–51.

¶ 96. Paragraph 53 of the majority opinion deserves special attention. Every sentence in ¶ 53 not only lacks a citation (except the last sentence) but also lacks support in the record. In fact, the record directly contradicts the linchpin of the whole paragraph. According to the majority opinion: "A reasonable farmer would know that switching to an unmedicated milk replacer could cause some increase in calf mortality."[49] Does "some increase" in mortality equal one-third of the calves? How does this court know, without testimony, what a reasonable farmer would expect under these circumstances? We know from the record that at least one expert stated that removal of antibiotics would not affect the calves' mortality rate. We can infer from the record that the lack of medication was not the cause of the deaths because calves ceased to die when the Grams substituted real, non-medicated milk for the non-medicated milk replacer. In short, according to the record, the Grams (and probably any reasonable farmer) would not have contemplated that the lack of medication would kill their calves at triple the normal rate.

¶ 97. The record in this case does not indicate that dead calves were an outcome contemplated by either party or by any reasonable farmer, thus making summary judgment inappropriate here.

¶ 98. For the foregoing reasons, I dissent.

¶ 99. I am authorized to state that Justice LOUIS B. BUTLER, JR. joins this opinion.

---

[49] Majority op., ¶ 53.