Badger State Bank, Plaintiff-Appellant,

v.

Roger A. Taylor, Rodney J. Taylor and Economy Feed Mill, Defendants-Respondents-Petitioners.

Supreme Court

*No. 03–0750. Oral argument October 5, 2004.—Decided November 2, 2004.*

2004 WI 128

(Also reported in 688 N.W.2d 439.)

For the defendants-respondents-petitioners there were briefs by *James P. Czajkowski, Lara Czajkowski Higgins* and *Czajkowski & Rider, S.C.,* Prairie du Chien, and oral argument by *James P. Czajkowski.*

For the plaintiff-appellant there was a brief by *Mark Bromley,* Platteville, and oral argument by *F. Bromley.*

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. This is a review of a published decision of the court of appeals reversing a judgment and an order of the Circuit Court

for Grant County, Robert P. VanDeHey, Judge.[1] The circuit court granted summary judgment to Roger Taylor, Rodney Taylor, and Economy Feed Mill (collectively the Taylors), dismissing Badger State Bank's complaint alleging that the Taylors were the recipients of fraudulent transfers within the meaning of the Wisconsin Uniform Fraudulent Transfer Act, specifically, Wis. Stat. § 242.05(1) (2001–02).[2]

¶ 2. The issue presented is whether a transfer constitutes a fraudulent transfer under Wis. Stat. § 242.05(1) of the Wisconsin Uniform Fraudulent Transfer Act when the transferees (here the Taylors) were unaware that the creditor (here the Bank) held a security interest in the accounts receivable of the debtor (here Vogt's Ag-Tech West, Inc.).

¶ 3. The court of appeals reversed the circuit court's judgment in favor of the Taylors, concluding that the Bank had established all of the elements required by Wis. Stat. § 242.05(1).[3] The court of appeals held that any transfer must be viewed exclusively from the perspective of the creditor Bank; the beliefs of the transferees regarding the nature of the transfer were not relevant to the analysis under § 242.05(1).[4] The court of appeals remanded the cause to the circuit court, directing it to enter judgment in favor of the Bank after it determines the amount of the judgment and the nature of any other remedies to which the Bank may be entitled.

---

[1] *Badger State Bank v. Taylor,* 2004 WI App 17, 268 Wis. 2d 774, 674 N.W.2d 872.

[2] All references to the Wisconsin statutes are to the 2001–02 version unless otherwise indicated.

[3] *Badger State Bank,* 268 Wis. 2d 774, ¶ 11.

[4] *Id.*

¶ 4. We hold, as did the court of appeals, that the Bank has met all the requirements of Wis. Stat. § 242.05(1) and is therefore entitled to summary judgment in its favor. Accordingly, we affirm the decision of the court of appeals reversing the judgment and order of the circuit court and remanding the cause to the circuit court with directions.

I

¶ 5. For purposes of the cross motions for summary judgment, the relevant facts are not in dispute. Ronald (Al) Vogt was the president and principal shareholder of Vogt's Ag-Tech West, Inc., a Wisconsin corporation. Ag-Tech was in the business of selling agricultural pesticides, fertilizer, and spraying services.

¶ 6. Badger State Bank made business loans to Ag-Tech. To secure its loans, the Bank held a perfected security interest in Ag-Tech's assets, specifically Ag-Tech's accounts receivable. Ag-Tech was indebted to the Bank at all times material to this action in the approximate amount of $446,000.

¶ 7. Roger and Rodney Taylor did business as Economy Feed Mill, an operation that sold livestock feed.

¶ 8. Ag-Tech sold pesticides, fertilizer, and spraying services to the Taylors for their feed business. The Taylors sold feed to A&T Livestock, LLC, a Wisconsin limited liability company organized under chapter 183 of the Wisconsin Statutes. A&T Livestock raised and sold hogs. Al Vogt was a member of A&T Livestock.

¶ 9. At the time of the transfer at issue in this case, the Taylors owed Ag-Tech $12,489, and A&T Livestock owed the Taylors $17,890. In a memo dated August 9, 2001, Al Vogt and the Taylors agreed to

316

cancel the accounts receivable, whereby Ag-Tech's account receivable from the Taylors would be forgiven in exchange for the Taylors forgiving their account receivable from A&T Livestock. Since the difference between the two accounts receivable was over $5,000, Al Vogt also paid, by check from Ag-Tech's account, an additional $2,350 to the Taylors in partial payment toward A&T Livestock's remaining debt to the Taylors.

¶ 10. The Bank sued the Taylors to set aside the cancellation of Ag-Tech's account receivable and cash payment as fraudulent transfers under Wis. Stat. § 242.05(1). The Bank asserted that its debtor, Ag-Tech, not Al Vogt individually, was the transferor, and that the transaction was fraudulent as to the Bank because Ag-Tech was indebted to the Bank, was insolvent, and did not receive "reasonably equivalent value" in exchange for the transfer. The Bank did not consider it relevant that the Taylors did not know of its security interest in the account receivable transferred to them.

¶ 11. On cross motions for summary judgment, the circuit court granted summary judgment to the Taylors. The circuit court determined that the Taylors were not dealing with corporate entities; they were dealing with Al Vogt personally. Thus, Al Vogt was not the Bank's debtor, the circuit court concluded, and the asset transferred (the Taylors' account receivable) was not an asset of Ag-Tech. Accordingly, the circuit court denied the Bank's motion for summary judgment, granted the Taylors' motion for summary judgment, and dismissed the Bank's complaint. The court of appeals reversed the judgment and order of the circuit court.

## II

¶ 12. In reviewing a grant of summary judgment, an appellate court applies the standards set forth in Wis. Stat. § 802.08(2) governing summary judgment in the same manner as the circuit court.[5] Summary judgment is properly granted when there are no issues of material fact, but only questions of law upon which the moving party is entitled to judgment.[6]

¶ 13. The interpretation of a statute and the application of a statute to undisputed facts are ordinarily questions of law that this court determines independently of the circuit court and the court of appeals, benefiting from their analyses.[7]

## III

¶ 14. A creditor pursuing a claim under Wis. Stat. § 242.05(1) must satisfy three requirements: (1) the creditor's claim arose before the transfer was made; (2) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer; and (3) the debtor either was insolvent at the time of the transfer or became insolvent as a result of the transfer.

¶ 15. Wisconsin Stat. § 242.05(1) provides as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the

[5] *Hubbard v. Messer,* 2003 WI 145 ¶ 7, 267 Wis. 2d 92, 673 N.W.2d 676.

[6] *Id.*

[7] *State v. Cole,* 2003 WI 59, ¶ 12, 262 Wis. 2d 167, 663 N.W.2d 700.

transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

¶ 16. It is undisputed that Ag-Tech was a "debtor"[8] of the "creditor" Bank.[9] It is further undisputed that the Bank's claim arose before the transfer was made. Further, because Ag-Tech's "debt"[10] exceeded its "assets,"[11] Ag-Tech was "insolvent"[12] under the Act. The parties agree that Al Vogt was not a debtor of the Bank.

¶ 17. Two requirements of Wis. Stat. § 242.05(1) are at issue in this case: (1) Was an asset of Ag-Tech transferred to the Taylors? And if it was, (2) Did Ag-Tech receive a reasonably equivalent value in exchange for the transferred asset?

¶ 18. First, the Taylors argue that the asset, the account receivable, was not an asset of Ag-Tech within

---

[8] " 'Debtor' means a person who is liable on a claim." Wis. Stat. § 242.01(6). "Claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Wis. Stat. § 242.01(3).

[9] " 'Creditor' means a person who has a claim." Wis. Stat. § 242.01(4).

[10] " 'Debt' means liability on a claim." Wis. Stat. § 242.01(5).

[11] " 'Asset' means property of a debtor . . . ." Wis. Stat. § 242.01(2). Statutory exclusions from the definition of an "asset" are not relevant to this case.

[12] "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Wis. Stat. § 242.02(2).

the meaning of Wis. Stat. § 242.05(1) and was never "transferred" by Ag-Tech to them.[13] The Taylors take this position because they believed they were dealing with Al Vogt personally and were unaware of the corporate and legal status of either Ag-Tech or A&T Livestock.

¶ 19. Second, from the Taylors' perspective, the transfer between Al Vogt and the Taylors was for reasonably equivalent value because Al Vogt cancelled the $12,489 they owed him, while they cancelled the $17,890 Al Vogt owed them.[14]

---

[13] " 'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." Wis. Stat. § 242.01(12).

[14] The Taylors proffered another way of calculating "reasonably equivalent value" for the first time in their Reply Brief and at oral argument. The Taylors assert that by wiping out each other's debt, Ag-Tech, A&T Livestock, and the Taylors were all able to stay in business. The "reasonably equivalent value," according to the Taylors, is this ability to remain in business. They cite *Image Worldwide, Ltd. v. Parkway Bank & Trust Co.*, 139 F.3d 574 (7th Cir. 1998), for this proposition.

Even if we ignore that the Taylors' new argument was waived because it was not presented anywhere in the circuit court, the court of appeals, or its main brief to this court, *Image Worldwide* does not compel the result the Taylors seek. Applying Illinois law based on the Uniform Fraudulent Transfer Act, *Image Worldwide* involved "reasonably equivalent value" within the context of "transfers" amongst corporate affiliates. The Seventh Circuit noted that indirect benefits could be considered as part of valuation, but only when the cross-stream guarantees (a transaction) strengthened the corporate group as a whole. Ultimately, however, the Seventh Circuit did label the transfer fraudulent and voided it because the transaction did not strengthen the corporate group. It was represented at oral

¶ 20. The Taylors argue that they were doing business with Al Vogt personally, as a sole proprietor, and at no time did business with the corporation, Ag-Tech. They maintain that they did not know Al Vogt was acting as an agent or employee of any corporate entity. According to the Taylors, Al Vogt never, either orally or through his correspondence, indicated that either Ag-Tech or A&T Livestock were separate legal entities from himself. None of the invoices and checks in the record from Ag-Tech included the word "Inc." in describing Ag-Tech so that a third party would know a corporate entity was involved.

¶ 21. They argue therefore that, as between the Taylors and Al Vogt, Al Vogt personally owned the account receivable, not Ag-Tech, and Al Vogt, not Ag-Tech, was the transferor. Under the Taylors' view of the facts, Al Vogt was not the Bank's debtor under § 242.05(1) and when Al Vogt cancelled the account receivable, Al Vogt was not transferring an asset of Ag-Tech, the Bank's debtor.

¶ 22. The fallacy in this argument is that the Taylors are looking at the transactions as involving only two parties (the Taylors and Al Vogt), rather than as involving three or four parties (the Taylors, Al Vogt, Ag-Tech, and A&T Livestock). By treating the transactions as involving only two parties, the Taylors ignore principles of agency law and Wis. Stat. § 242.05(1). Wisconsin Stat. § 242.10 provides that the law relating to principal and agent supplements chapter 242.[15]

---

argument that both Ag-Tech and A&T Livestock went out of business soon after these transactions.

[15] Wisconsin Stat. § 242.10 reads: "Unless displaced by this chapter, the principles of law and equity, including the law merchant and the *law relating to principal and agent,* estoppel, laches, fraud, misrepresentation, duress, coercion, mistake,

Nothing in § 242.05(1) indicates that it displaces the law relating to principal and agent.

¶ 23. Here, Al Vogt, as the president and sole shareholder of Ag-Tech, was the agent of Ag-Tech.[16] Under agency law Ag-Tech was either a partially disclosed principal[17] or an undisclosed principal.[18]

¶ 24. Al Vogt was acting on behalf of Ag-Tech when he engaged in the transactions that eventually led to the Taylors owing Ag-Tech money.[19] The goods Al Vogt sold to the Taylors belonged to Ag-Tech, as did the account receivable resulting from the sale. Ag-Tech

___

insolvency or other validating or invalidating cause, supplement this chapter" (emphasis added).

[16] *See Diederich v. Wis. Wood Prods., Inc.,* 247 Wis. 212, 218, 19 N.W.2d 268 (1945) ("The general rule is that the president, treasurer, secretary and other officers of a corporation are merely its agents . . . . [A] president who is also general manager of a corporation has the implied power to do anything that the corporation could do within the general scope of its business.") (internal quotations and citations omitted).

[17] When a third party is aware that the agent is acting on behalf of a principal, but unaware of the identity of the principal, that principal is "partially disclosed." Restatement (Second) of Agency § 4(2) (1959). This section is quoted with approval in *Benjamin Plumbing, Inc. v. Barnes,* 162 Wis. 2d 837, 848–49, 470 N.W.2d 888 (1991).

[18] An undisclosed principal exists when the third party has no notice that the agent is acting on behalf of a principal. Restatement (Second) of Agency § 4(3) (1959).

[19] *See* Restatement (Second) of Agency § 307(1)(a) (1959) ("[U]ntil the existence of the principal is known, the agent has power to rescind, perform and receive performance of the contract and to modify it with binding effect, if the contract or conveyance, as modified, is within his agency powers.").

apparently acquiesced in and performed the transactions Al Vogt arranged with the Taylors.[20]

¶ 25. An undisclosed or partially disclosed principal, like Ag-Tech, becomes a party to a transaction between the agent (Al Vogt) and the third party (the Taylors) even if the third party (the Taylors) is unaware of the name or existence of the principal.[21] Thus, had the Taylors defaulted in paying Al Vogt, Ag-Tech could have sued the Taylors for the funds they owed the corporation. Likewise, had Al Vogt (or Ag-Tech) failed to perform under the sales agreements, the Taylors could have sued either Al Vogt, or Ag-Tech, or both.

¶ 26. We must also examine the cancellation of the account receivable under agency law. Had the Taylors paid Al Vogt to cancel the account receivable, Ag-Tech (the principal) could not have recovered pay-

---

[20] *See Johnson v. Associated Seed Growers, Inc.,* 240 Wis. 278, 282–83, 3 N.W.2d 332 (1942) (no proof as to express authority of agent but sufficient proof that principal acquiesced in and performed contract and benefited by accepting the warehouse receipts; consequently, agent can be deemed to have possessed necessary authority to negotiate on behalf of principal and agent-principal status existed).

[21] Restatement (Second) of Agency § 7 cmt. d; § 186, cmt. (1959). *See also Benjamin Plumbing, Inc. v. Barnes,* 162 Wis. 2d 837, 855, 470 N.W.2d 888 (1991) ("Clearly, it has long been the rule in Wisconsin that a corporation can be contractually bound even where the corporate name was not used in the contract.").

*See also Indiana Gas Co. v. Home Ins. Co.,* 141 F.3d 314, 319 (7th Cir. 1998) ("The proposition that an agent for an undisclosed principal is liable does not imply that the undisclosed principal is not bound by the contract; the full statement of the 'venerable rule' is that both agent and principal are bound." (emphasis omitted) (citing Restatement (Second) of Agency §§ 186, 302)).

ment from the Taylors. Al Vogt would have been Ag-Tech's agent in accepting the payment, and payment to the agent would be payment to the principal. Wisconsin Stat. § 242.05(1) changes this dynamic. Under agency law, Al Vogt acted as agent on behalf of his principal (Ag-Tech) in cancelling the account receivable and giving the Taylors the check drawn on Ag-Tech's account. Because Ag-Tech made the transfers to the Taylors (through its agent, Al Vogt), under Wis. Stat. § 242.05(1), Ag-Tech is the transferor of the account receivable and the check.

¶ 27. In sum, when the transactions between Al Vogt and the Taylors are properly viewed as three- or four-party transactions under agency law and Wis. Stat. § 242.05(1), the account receivable belonged to Ag-Tech and Ag-Tech transferred the account receivable and the check to the Taylors.[22]

¶ 28. The next question, then, is whether Ag-Tech received reasonably equivalent value for the transfer under Wis. Stat. § 242.05(1).[23]

¶ 29. The Taylors argued that by collapsing the two distinct legal entities (Ag-Tech and A&T Livestock) into one (Al Vogt), the approximately $15,000 they received from Ag-Tech was compensated for by the

---

[22] The Bank is concerned only with the transfer from Ag-Tech to the Taylors. They are not concerned about the A&T Livestock account receivable. Nothing in this opinion prevents them from seeking their almost $18,000 from A&T Livestock.

[23] "Reasonably equivalent value" is not defined in the Uniform Fraudulent Transfer Act. "Value" is defined as follows: "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." Wis. Stat. § 242.03(1).

almost $18,000 they cancelled as owing them from A&T Livestock. The Taylors' argument makes sense if Ag-Tech, A&T Livestock, and Al Vogt were all one legal entity. They were not. The record reflects three entities existed: Ag-Tech, A&T Livestock, and Al Vogt.

¶ 30. From the perspective of the creditor Bank, when Al Vogt cancelled Ag-Tech's account receivable, Ag-Tech was insolvent and received nothing in return for the cancellation. It was A&T Livestock that benefited from the transaction, not Ag-Tech.[24] Therefore, canceling the two accounts receivable, while of value to the Taylors, did not inure to the benefit of Ag-Tech at all.

¶ 31. We conclude, as did the court of appeals, that Ag-Tech did not receive reasonably equivalent value for the loss of its cash and account receivable.

¶ 32. Having resolved the two disputed statutory requirements against the Taylors, namely, whether the account receivable was an asset of the debtor Ag-Tech that was transferred by Ag-Tech, and whether Ag-Tech received reasonably equivalent value, we conclude that the transfer satisfied the requirements of Wis. Stat. § 242.05(1). The Taylors argue, however, that the transfer should not be held to be a fraudulent transfer under Wis. Stat. § 242.05(1). They urge the court to interpret

---

[24] Al Vogt was an agent of A&T Livestock, as well as of Ag-Tech. Under Wis. Stat. § 183.0301(1)(a), "[e]ach member [of a limited liability company] is an agent of the limited liability company . . . for the purpose of its business.". The statute further provides that "[t]he act of any member . . . binds the limited liability company . . . ." Wis. Stat. § 183.0301(1)(b). When the Taylors agreed with Al Vogt, as agent of his undisclosed principal A&T Livestock, to release the almost $18,000 owed to the Taylors, the benefit flowed to A&T Livestock, not Ag-Tech.

the statute to protect innocent parties so that a bona fide purchaser's title to property is beyond the reach of the transferor's creditors.

## IV

¶ 33. The Taylors claim to be similar to bona fide purchasers for value; that is, they claim to be parties who entered into a transaction in good faith and for value. In sum, the Taylors ask the court to interpret Wis. Stat. § 242.05(1) from their perspective as innocent transferees.

¶ 34. The Taylors derive this transferee-oriented interpretation by examining the entire Wisconsin Uniform Fraudulent Transfer Act.

¶ 35. The Taylors point out that Wis. Stat. § 242.04(1)(a) proscribes transfers made with "actual intent to hinder, delay or defraud any creditor"[25] and protects transfers to a person who had no knowledge of a transferor's intent and "who took in good faith and for a reasonably equivalent value."[26] These provisions give transferees the means to know of the existence of a potential fraud, and the transferees can protect them-

---

[25] Wisconsin Stat. 242.04(1)(a) reads as follows: "A transfer made or obligations [sic] incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay or defraud any creditor of the debtor . . . ."

Section 242.04(1)(a)(1) requires proof of the debtor's intent, whereas § 242.05(1) does not.

[26] Wis. Stat. § 242.08(1).

selves by refusing to participate in the transfer. These provisions give transferees a defense against the creditor.

¶ 36. The Taylors would like to be able to use the defenses provided in Wis. Stat. § 242.08(1), but these defenses by the explicit language of § 242.08(1) apply only to claims made under § 242.04(1)(a).[27] The defenses have no bearing on the Bank's claim made here under § 242.05(1).

¶ 37. We agree with the Bank and the court of appeals that we must examine the requirements of a claim under Wis. Stat. § 242.05(1), not the requirements of a claim and the defenses available under other provisions of chapter 242.

¶ 38. Section 242.05(1) is a "constructive fraud" provision.[28] It provides a per se rule. Good faith is not relevant in § 242.05(1). Section § 242.05(1) does not require that the Taylors be guilty of any fraud.[29]

---

[27] Wisconsin Stat. § 242.08(1) provides: "A transfer or obligation is not voidable under s. 242.04(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."

Another statute providing a defense is Wis. Stat. § 242.05(2), which renders a transfer to an insider a fraudulent transfer when the insider had reasonable cause to believe that the debtor was insolvent. Neither party raised this issue of whether Al Vogt qualified as an insider. In any event, the Bank brought its claim under § 242.05(1).

[28] Frederick Tung, *Limited Liability and Creditors' Rights: The Limits of Risk Shifting to Creditors,* 34 Ga. L. Rev. 547, 562–63 (2000).

[29] Although the court of appeals supported its decision by asserting that Wis. Stat. § 242.05(1) is clear on its face, the court of appeals nevertheless relied on *Wirtz v. Jensen,* 238 Wis. 334, 341, 298 N.W. 172 (1941), for the proposition that the statute does not require a showing that the transferee possesses fraudulent intent.

Indeed, no one ascribes wrong intent or evil purpose to the Taylors.[30]

¶ 39. The usual motive for transfers without reasonably equivalent value in exchange is to hinder creditors, and in fact such transfers ordinarily do hinder creditors.[31] But such intent is difficult to prove, and the drafters of the Uniform Fraudulent Transfer Act included provisions addressing transactions that might be considered wrongful toward creditors even if a debtor's intent to hinder, delay, or defraud is not proven.[32] The focus in "constructive fraud" shifts from a subjective intent to an objective result.[33] Proof of "constructive fraud" simply entails proof of the requirements of the statute.

The Taylors distinguish *Wirtz* on its facts and law. Regarding the facts, in *Wirtz* (unlike in the present case) the transferees were aware that the transferor was the debtor of another and that the transfer would hinder the transferor's creditors. In *Wirtz,* the legal issue was whether the transferees must participate in the fraudulent intent for the transfer to be fraudulent. Intent is not an issue in the present case.

[30] Peter A. Alces, *Generic Fraud and the Uniform Fraudulent Transfer Act,* 9 Cardozo L. Rev. 743, 743 (1987) ("But the bad man [in the Uniform Fraudulent Transfer Act] to which I allude is not necessarily bad, except perhaps from the perspective of an all-assets secured creditor.").

[31] *The Nostalgia Network, Inc. v. Lockwood,* 315 F.3d 717, 719 (7th Cir. 2002).

[32] *See* Unif. Fraudulent Transfer Act prefatory note, 7A U.L.A. 269 (1999); Tung, *supra* note 28, at 563; Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law and Its Proper Domain,* 38 Vand. L. Rev. 829, 830–32 (1985); Barry L. Zaretsky, *Fraudulent Transfer Law as the Arbiter of Unreasonable Risk,* 46 S.C. L. Rev. 1165, 1166–67 (1995).

[33] Tung, *supra* note 28, at 562–63; Louis J. Verner, *Transfers in Fraud of Creditors Under the Uniform Acts and the Bankruptcy Code,* 92 Com. L.J. 218, 233–37 (1987).

¶ 40. The Taylors' argument that Wis. Stat. § 242.05(1) should be interpreted from their perspective runs counter to the objectives of the Uniform Fraudulent Transfer Act. The Wisconsin legislature enacted the Uniform Fraudulent Transfer Act as chapter 242 in 1987. The Uniform Fraudulent Transfer Act, which was adopted by the National Conference of Commissioners on Uniform State Laws in 1984, has been adopted by more than 40 states.[34] The goal in the interpretation of

[34] *See* Unif. Fraudulent Transfer Act, 7A U.L.A. 266 (Supp. 2004).

The Uniform Fraudulent Transfer Act replaced the Uniform Fraudulent Conveyances Act, which was adopted by the Conference in 1918 and enacted in Wisconsin in 1919. *See* Analysis of 1987 S.B. 115, available at the Legislative Reference Bureau, Madison, Wisconsin.

The sources of the Uniform Act date back to English and European law. Fraudulent conveyance law in the United States has its roots in the 1570 Statute of 13 Elizabeth, which prohibited a wide array of fraudulent conveyances. Verner, *supra* note 33, at 219. However, the concept of voiding fraudulent conveyance has much earlier roots, both in England and on the European Continent. *See* Verner, *supra* note 33, at 218. Fraudulent conveyances were prohibited as early as 1215 through a provision of the Magna Carta. *Id.* at 218 & n.1 (citing the Magna Carta c. 32: "No freeman henceforth shall give or sell more of his land, but so that of the residue of the lands, the lord of the fee may have the service due him, which belongs to the free."). In Europe the concept can be traced to the Justinian Code: "Again, if any one has transferred his property to another in fraud of his creditors, upon judgment to that effect by the chief provincial magistrate, the creditors of the transferor may seize his property, avoid the transfer and recover the things transferred . . . ." Max Radin, *Fraudulent Conveyances at Roman Law*, 18 Va. L. Rev. 109, 109 (1931) (quoting the Institutes of Justinian (Justinian Code)). *See also* Unif. Fraudulent Transfer Act prefatory note, 7A U.L.A. 268 (1999).

uniform laws is uniformity among the states.[35]

¶ 41. The Uniform Fraudulent Transfer Act reflects a strong desire to protect creditors and to allow for the smooth functioning of our credit-based society.[36] It is a creditor-protection statute.[37] Without such protection for creditors, "[c]reditors would generally be unwilling to assume the risk of the debtor's fraudulent transfers."[38]

¶ 42. In accordance with the objectives of the

[35] Wis. Stat. § 242.11.

[36] Frank R. Kennedy, *Involuntary Fraudulent Transfers,* 9 Cardozo L. Rev. 531, 534 (1987) ("If an economic system employing credit is to function efficiently, creditors must be able to enforce obligations assumed by or imposed on their debtors. The law of fraudulent and preferential transfers consists of rules that have developed to enable creditors to enforce the duty of a debtor to be fair to all creditors."); *see also* Uniform Law Commissioners, *Why State Should Adopt the Uniform Fraudulent Transfer Act,* available online at http://www.nccusl.org/Update/uniformact_why/uniformacts-why-ufta.asp ("Credit is essential to the economic life of this country. . . . Credit remains available so long as those who extend it are given assurances about their rights at default. The Uniform Fraudulent Transfer Act provides assurances to creditors that help make credit available to all of us.").

[37] Christian C. Day et al., *Riding the Rapids: Financing the Leveraged Transaction Without Getting Wet,* 41 Syracuse L. Rev. 661, 700 (1990) ("The Uniform Fraudulent Transfer Act is the latest stage in a long evolution which has sought to protect creditors from the fraudulent transfer of property by debtors."); H. Bruce Bernstein, *Leveraged Buyouts and Fraudulent Conveyances: Yet Another Update,* 7 J. Bankr. L. & Prac. 315, 316 (1998) ("This ancient creditor protection device [the avoidance of a fraudulent transfer] has found its way into the law of the United States in four basic ways . . . (iii) the Uniform Fraudulent Transfer Act . . . .").

[38] Tung, *supra* note 28, at 563–64.

drafters of the Uniform Fraudulent Transfer Act, the Legislative Reference Bureau's analysis of the bill creating chapter 242 describes the goal of proscribing constructive fraud as follows: The bill "creates a class of transfers of property by debtors that is fraudulent to creditors and provides defrauded creditors with remedies. This class of transfers could generally have the effect of depriving creditors of assets that would otherwise be available to satisfy debts when the debtor becomes insolvent or is about to become insolvent."[39]

¶ 43. Both the language of chapter 242 and the policies motivating the Uniform Fraudulent Transfer Act are couched in terms of creditor protection. The purpose and scope of chapter 242 can therefore properly be understood only if viewed from the perspective of the creditor (the Bank), not the transferee (the Taylors).[40] From the creditor's perspective, the present case falls squarely into Wis. Stat. § 242.05(1), the transferee has no defenses, and the creditor is protected. Viewed from the Bank's perspective, its debtor, Ag-Tech, was insolvent, cancelled a $12,000 claim against the Taylors, gave the Taylors a check in the sum of $2,350, and received nothing in return.

¶ 44. The circuit court erred as a matter of law by focusing on the transferee's point of view. The transferee's subjective state of mind does not play a role in resolving the present case under Wis. Stat. § 242.05(1).

¶ 45. For the reasons set forth, we hold, as did the court of appeals, that the Bank has met all the require-

---

[39] Legislative Reference Bureau Analysis of 1987 S.B. 115. The prefatory note (analysis) is distributed to all legislators. *See* Wis. Stat. § 13.92(1)(b)2.

[40] *Kirkland v. Risso,* 98 Cal. App. 3d 971, 977 (1979) (interpreting a substantially similar constructive fraud provision).

331

ments of Wis. Stat. § 242.05(1) and is therefore entitled to judgment in its favor. Accordingly, we affirm the decision of the court of appeals reversing the judgment and order of the circuit court and remanding the cause to the circuit court with directions.

*By the Court.*—The decision of the court of appeals is affirmed.