In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 12-3144, 12-3145, 12-3146, 12-3147, 12-3148,
12-3149, 12-3150 & 12-3807

RAY FELDMAN, *et al.*,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

Appeals from the United States Tax Court.
Nos. 26737-08, 27387-08, 27388-08, 27389-08, 27390-08,
27391-08, 27392-08 & 27393-08 — **Stephen J. Swift**, *Judge*.

ARGUED SEPTEMBER 19, 2013 — DECIDED FEBRUARY 24, 2015

Before MANION, KANNE, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. This appeal raises a question of transferee liability under 26 U.S.C. § 6901 for a dissolved corporation's unpaid federal taxes. The "transferees" are the former shareholders of a closely held Wisconsin corporation that for many decades owned and operated a dude ranch in

the northwestern part of the state. When the ranch was sold, the shareholders planned to liquidate, but the asset sale had produced a sizable gain and the corporation faced significant federal and state tax liability. A tax-shelter firm swooped in with a proposal for an intricate tax-avoidance transaction as a more profitable alternative to a standard liquidation. This should have called to mind the warning that "if something seems too good to be true, then it probably is." But alas, it did not. The shareholders took the deal, effectively liquidating the corporation without absorbing the financial consequences of the tax liability. The taxes were never paid.

The IRS sought to hold the former shareholders responsible for the tax debt as transferees of the defunct corporation under § 6901 and Wisconsin law of fraudulent transfer and corporate dissolution. The tax court sided with the IRS and found the shareholders liable for the unpaid taxes and penalties. We affirm.

## I. Background

William Feldman founded Woodside Ranch in the 1920s. Located in the small town of Mauston in northwest Wisconsin, the ranch was incorporated in 1952 as Woodside Ranch Resort, Inc. ("Woodside") and was treated as a Subchapter C corporation for federal tax purposes. Over time the ranch came to offer a wide array of outdoor activities, including horseback riding, boating, and snowmobiling. Until its sale in 2002, Woodside was owned and operated by the descendants of its founder.

By the late 1990s, the ranch was facing a number of challenges to its ongoing viability. Nearby casinos and water parks competed with the ranch for business, the next generation of Feldmans had no interest in continuing to run the ranch, and the shareholders and directors were approaching or had already reached retirement age. At this point Woodside had ten shareholders, all descendants of its founder.[1] Lucille Nichols, daughter of founder William Feldman, was the president; grandsons Richard Feldmann and Ray Feldman were vice-president and secretary, respectively;[2] and great-granddaughter Carrie Donahue was the treasurer. The shareholders decided it was time to sell.

Selling the ranch raised a number of concerns. In particular, the shareholders anticipated that the corporation would incur significant tax liability. Woodside's assets had been purchased long ago, so a sale would give rise to a large taxable capital gain. The shareholders also worried about future personal-injury claims against the resort. The outdoor activities at the ranch inevitably produced some accidents and injuries every year. Most were minor, few resulted in formal claims, and most claims were settled in kind with free return visits and payment of medical expenses. Sometimes personal-injury

---

[1] The shareholders, their relationship to the founder, and their ownership interests are as follows: daughter Lucille Nichols (9.74%); grandsons Ray Feldman (33.12%), Richard Feldmann (18.9%), and Robert Donahue (1.29%); granddaughters Jan Reynolds (12.99%), Sharon Coklan (7.14%), and Rhea Dugan (2.52%); and great-granddaughters Emma McClintock (5.84%), Carrie Donahue (5.84%), and Jill Reynolds (2.6%).

[2] For unknown reasons, Richard spells his last name "Feldmann."

claimants sought monetary damages, but apparently not often enough to justify purchasing expensive liability insurance; premium estimates were in the $200,000 to $400,000 range, so Woodside opted not to carry liability coverage.

In the fall of 2001, the shareholders opened negotiations to sell the ranch to Damon Zumwalt. They proposed a stock sale, but Zumwalt rejected it out of hand and insisted on an asset sale. The shareholders accepted Zumwalt's terms, and the transaction closed on May 17, 2002. Zumwalt formed Woodside Ranch LLC and purchased Woodside's assets for the sum of $2.6 million and certain noncompete and consulting agreements. The parties expected that Zumwalt would continue to operate the ranch.

After the asset sale, Woodside—the Feldman family's corporation, not the ranch—ceased carrying on any active business. It was, in the words of shareholder and secretary Ray Feldman, an "empty shell" consisting of cash on hand along with a few notes and receivables.

The asset sale had netted about $2.3 million, resulting in a taxable capital gain of $1.8 million (on a basis of approximately $510,000). This triggered combined federal and state tax liabilities of about $750,000. While the asset sale to Zumwalt was still pending, Fred Farris, Woodside's accountant and financial advisor, introduced the shareholders to representatives of MidCoast Credit Corp. and Midcoast Acquisition Corp. (collectively "Midcoast"). Owned by Michael Bernstein and Honora Shapiro, Midcoast specialized in structured transactions designed to avoid or minimize tax liabilities. As relevant here, Midcoast offered to purchase the stock of C corporations

like Woodside that had recently experienced a taxable asset sale, promising to pay more for the shares than they were worth in a liquidation. Then, using bad debts and losses purchased from credit-card companies, Midcoast would offset (i.e., eliminate) the unpaid tax liabilities of the acquired corporation by way of a net-operating-loss carryback.

Billed as a "no-cost liquidation," Midcoast proposed this strategy to Woodside's shareholders as an attractive tax-avoidance alternative to liquidating the corporation. As part of the pitch, Midcoast sent promotional materials outlining the structure of the transaction and explaining that selling their stock to Midcoast would yield a higher return for the shareholders than a standard liquidation by reducing the tax consequences of Woodside's asset sale.

Woodside's finance committee (Richard Feldmann, Ray Feldman, and Carrie Donahue) initially recommended liquidation, but Woodside's board of directors opted to pursue Midcoast's tax-avoidance strategy and entered into negotiations for a stock sale to Midcoast. On June 17, 2002, the finance committee held a conference call with Midcoast representatives to discuss the specifics of the transaction. On June 18 Midcoast sent a letter of intent offering to buy 100% of Woodside's stock for a price equal to the cash in the company as of the closing date reduced by 70% of the tax liability. Stated differently, the purchase price represented Woodside's liquidation value (about $1.4 million) plus a "premium" of about $225,000. Ray Feldman transmitted the proposal to the shareholders by letter the next day, noting that:

> MidCoast promises … to pay Woodside's taxes
> because the corporation would not be liquidated
> but instead be kept alive as a going concern as a
> part of the MidCoast organization. This deal is
> profitable for MidCoast because MidCoast
> purchases large amounts of defaulted and delin-
> quent credit card accounts from the major credit
> card companies … and carries forward such
> losses to offset against the purchase of "profit-
> able" corporation[s] such as Woodside.

Although this letter mentions a "promise" by Midcoast to pay Woodside's taxes, all shareholders understood that Midcoast intended to claim a loss to offset the capital gain from the sale of the ranch.

The shareholders met to discuss Midcoast's proposal and ultimately approved it. As the deal moved forward, the shareholders conducted some basic research on Midcoast. For example, they obtained a Dunn & Bradstreet report on the firm and called a few of Midcoast's references.

The transaction closed on July 18, 2002. The parties signed a share purchase agreement with a purchase price equal to Woodside's cash on hand less $492,139.20 (about 70% of Woodside's tax liability). The agreement stated that Woodside had no liabilities other than federal and state taxes. Midcoast was prohibited from liquidating or dissolving Woodside within four years of the stock sale. (Farris suggested adding this term based on concerns about the shareholders' liability if Midcoast did not pay Woodside's taxes.) The agreement also capped the shareholders' liability for any future personal-

injury claims at an amount equal to the "premium." This was a point of contention during negotiations, but Midcoast ultimately agreed to the liability cap.

The closing involved a number of steps in quick succession on July 18. First, Woodside redeemed 20% of its stock directly from the shareholders. The proceeds of this transaction were transferred to Woodsedge LLC, an entity specially created by the shareholders to receive the proceeds of the stock sale. The precise purpose of the redemption is not entirely clear from the record, but afterward Woodside's only asset was cash in the amount of about $1.83 million; the corporation had no liabilities other than federal and state taxes—again, approximately $750,000—and unknown future personal-injury claims.

The parties then executed the share purchase agreement and two escrow agreements to facilitate the transaction. The shareholders and Midcoast were parties to the first escrow agreement; Midcoast and Honora Shapiro—50% owner of Midcoast—were parties to the second. The law firm of Foley & Lardner was the escrow agent under both agreements, and funds were wired into and out of its trust account as follows. First, at 12:09 p.m. on July 18, Woodside's cash reserves of $1.83 million were transferred into the trust account. Then, at 1:34 p.m. Shapiro transferred $1.4 million into the trust account, purportedly as a loan to Midcoast to fund the transaction, although there is no promissory note or other writing evidencing a loan, and (as we will see) the money was immediately returned to Shapiro. At 3:35 p.m. $1,344,451 was wired to Woodsedge LLC as payment to the shareholders. A minute

later, at 3:36 p.m., $1.4 million was returned to Shapiro, repaying the undocumented "loan."

The next day $452,728.84 was transferred from the trust account to a newly created Woodside account at SunTrust Bank controlled by Midcoast, Woodside's new owner. The remaining funds in the escrow—approximately $38,000—were disbursed to Foley & Lardner and another law firm as professional fees.

After the stock sale, Woodside had $452,729 cash on hand and state and federal income-tax liability of approximately $750,000. Although the corporation had no income, no employees, no tangible assets, and no operating activities, Midcoast charged Woodside a "professional service fee" of $250,000 and a "management fee" of $30,000 per month. By July 22—four days after the closing—Midcoast had withdrawn $442,000 from Woodside's account at SunTrust Bank, leaving only about $10,000. Woodside thereafter posted a $1.2 million loan receivable due from Midcoast. This accounting entry was meant to reflect a Midcoast "debt" to Woodside for the money that was returned to Shapiro—as if Woodside had "repaid" the Shapiro "loan" on Midcoast's behalf.

On July 22 Woodsedge LLC, which was holding the proceeds of the redemption and stock sale, disbursed approximately $1.2 million to the shareholders. Sometime later, the shareholders—through Woodsedge LLC—paid $50,000 to settle a personal-injury claim brought against Woodside stemming from an event preceding the asset sale. Woodside incurred no further personal-injury liability.

In December 2003 Midcoast sold the Woodside stock to Wilder Capital Holdings, LLC. No money changed hands in this transaction, but Wilder assumed Midcoast's $1.2 million "debt" to Woodside. A month after this "sale," the $1.2 loan receivable listed on Woodside's books was marked "paid," though Woodside in fact received no payment.

Woodside never paid federal taxes on the capital gain from the asset sale. Its 2002 federal tax return, filed in September 2003, showed a tax due of $454,292 (based on the gain from the Zumwalt asset sale). No amount was paid with this filing. Woodside's 2003 tax return, filed in February 2005, claimed a net operating loss carried back to 2002, reducing Woodside's 2002 federal tax liability to zero.

In September 2006 the IRS issued a notice of deficiency to Woodside for the 2002 tax year. The Commissioner of Internal Revenue had determined that the net operating loss was based on sham loans and was part of an illegal distressed asset/debt tax shelter. *See generally* INTERNAL REVENUE SERVICE, COORDI-NATED ISSUE PAPER – DISTRESSED ASSET/DEBT TAX SHELTERS (Apr. 18, 2007), *available at* http://www.lb7.uscourts.gov/documents/12-33671.pdf. Woodside did not respond to the deficiency notice.

In September 2008 the IRS sent notices to the former shareholders assessing transferee liability for Woodside's unpaid taxes and penalties under § 6901. (For ease of reference, we'll drop the reference to *former* shareholders and just call them "shareholders" for the balance of this opinion.) The amount of the individual assessments varied according to each shareholder's ownership interest from a low of $21,275 to a

high of $524,514. The shareholders petitioned the tax court seeking to overturn the Commissioner's determination.[3] In the meantime, on August 13, 2009, Woodside was administratively dissolved.

At trial before the tax court, the shareholders stipulated that the tax shelter was illegal but contested transferee liability. In a comprehensive opinion, the tax court ruled in the Commissioner's favor, holding that the stock sale was in substance a liquidation with no purpose other than tax avoidance, making the shareholders transferees of Woodside under § 6901 and Wisconsin law governing fraudulent transfers and corporate dissolutions. The court entered decision upholding the Commissioner's assessment of transferee liability for the dissolved corporation's unpaid taxes and penalties. After an unsuccessful motion for reconsideration, the shareholders appealed.[4] We consolidated the appeals for argument and decision.

## II. Discussion

Tax-court decisions are reviewed "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). Accordingly, we review the tax court's factual findings for clear error, its legal conclusions de novo, and its application of the law to

[3] All except Lucille Nichols, who had died. Her estate did not participate in the proceedings.

[4] Sharon Coklan later withdrew her appeal.

the facts for clear error. *Kikalos v. Comm'r*, 434 F.3d 977, 981–82 (7th Cir. 2006); *Yosha v. Comm'r*, 861 F.2d 494, 499 (7th Cir. 1988) ("The question whether a particular transaction has economic substance, like other questions concerning the application of a legal standard to transactions or events, is governed by the clearly erroneous standard.").

Section 6901 of the Internal Revenue Code authorizes the IRS to proceed against the transferees of delinquent taxpayers to collect unpaid tax debts.[5] But the statute provides only a procedural device for proceeding against a taxpayer's transferee. *See Comm'r v. Stern*, 357 U.S. 39, 42–43 (1958) (holding that the predecessor to § 6901 "is purely a procedural statute"). Substantive liability is governed by state law. *Id.* at 45 (explaining that "the existence and extent of [transferee] liability should be determined by state law").

---

[5] In relevant part, the statute provides as follows:

> **(a) Method of collection.**—The amounts of the following liabilities shall … be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:
>
> **(1) Income, estate, and gift taxes.**—
>
> **(A) Transferees.**—The liability, at law or in equity, of a transferee of property—
>
> **(i)** of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes)[.]

26 U.S.C. § 6901(a)(1)(A)(i).

Accordingly, transferee-liability cases under § 6901 proceed in two steps. First, the Commissioner must establish that the target is a "transferee" of the taxpayer within the meaning of § 6901. Second, the Commissioner must establish that the transferee is liable for the transferor's debts under some provision of state law. *Id.* at 42–45.

### A. Transferee Status Under § 6901

The term "transferee" in § 6901 is defined broadly to include any "donee, heir, legatee, devisee, and distributee." I.R.C. § 6901(h). The tax court found that the stock sale was structured to avoid the tax consequences of Woodside's asset sale, which the shareholders would have had to absorb had they pursued a standard liquidation. Formally, the shareholders sold their Woodside stock to Midcoast, which purported to fund the transaction via a loan from Honora Shapiro. But the tax court looked past these formalities to the substance of the transaction, recasting it as a liquidation. In other words, the court found that Midcoast did not actually pay the shareholders for their stock; instead, each shareholder received a pro rata distribution of Woodside's cash on hand— the proceeds of the asset sale—making them "transferees" as that term is broadly defined in § 6901(h).

This mode of analysis implicates several related, overlapping doctrines used in tax cases and in other areas of the law for the protection of creditors. Known by different names— e.g., the "substance over form" doctrine, the "business purpose" doctrine, the "economic substance" doctrine—the animating principle of each is that the law looks beyond the

form of a transaction to discern its substance.[6] *See generally* 1 BORIS I. BITTKER & LAWRENCE LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 4.3 (3d ed. 1999 & 2012 Cum. Supp. No. 3).

For example, it has long been established that taxing authorities and courts may look past the form of a transaction to its substance to determine how the transaction should be treated for tax purposes. *See, e.g.*, *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978) ("'In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding.'" (quoting *Helvering v. F. & R. Lazarus & Co.*,

---

[6] The distinctions between these doctrines are subtle, if they exist at all. *See Rogers v. United States*, 281 F.3d 1108, 1115 (10th Cir. 2002) ("It is evident that the distinctions among the judicial standards which may be used in ex post facto challenges to particular tax results—such as the substance over form, substantive sham/economic substance, and business purpose doctrines—are not vast."); *see also* Joseph Bankman, *The Economic Substance Doctrine*, 74 S. CAL. L. REV. 5, 12 (2000) ("[T]he differences between the doctrines are apt to be smaller than first imagined."). The Commissioner takes the position that the substance-over-form and economic-substance doctrines are similar but not identical, and thus can be applied independently. *See Rogers*, 281 F.3d at 1116 ("The Treasury Department … envisions the appropriateness of applying the substance over form doctrine in a case like the present one while reserving the economic substance analysis for situations where the economic realities of a transaction are insignificant in relation to the tax benefits of the transaction." (citing U.S. DEP'T OF THE TREASURY, THE PROBLEM OF CORPORATE TAX SHELTERS 46–58 (1999), *available at* http://www.treasury.gov/resource-center/tax-policy/Documents/ctswhite.pdf.)). The Commissioner relies primarily on the substance-over-form doctrine in this case.

308 U.S. 252, 255 (1939))); *Grojean v. Comm'r*, 248 F.3d 572, 574 (7th Cir. 2001) ("[I]n federal taxation substance prevails over form.").

Similarly, the "business purpose" doctrine requires that a transaction have a bona fide nontax business purpose in order to be respected for tax purposes. *See Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Comm'r v. Transp. Trading & Terminal Corp.*, 176 F.2d 570, 572 (2d Cir. 1949) (Hand, C.J.) ("The doctrine of *Gregory v. Helvering* … means that in construing words of a tax statute which describe commercial or industrial transactions we are to understand them to refer to transactions entered upon for commercial or industrial purposes and not to include transactions entered upon for no other motive but to escape taxation.").

The so-called "economic substance" doctrine borrows heavily from both the business-purpose and substance-over-form doctrines. *See* 1 BITTKER & LOKKEN, *supra*, ¶ 4.3.4A ("The substance over form and business purpose concepts are closely related and have effectively coalesced in some cases, developing an economic substance doctrine … ."). Formulations of this doctrine vary, but the general idea is that a transaction has economic substance (and thus will be respected for tax purposes) if it "changes in a meaningful way … the taxpayer's economic position" and the taxpayer has a valid nontax business purpose for entering into it. I.R.C. § 7701(o) (statutory

clarification of the economic-substance doctrine); *see also Grojean*, 248 F.3d at 574.[7]

Here, the tax court drew on both the substance-over-form principle and the economic-substance doctrine to conclude that the stock sale should be recast as a liquidation. The court noted that from the beginning, Midcoast had characterized the transaction as a "no-cost liquidation." Woodside had no active business at the time of the transaction. It was a shell corporation consisting only of cash from the asset sale, so the stock did not represent equity in a company, and all the cash on hand was transferred to the Foley & Lardner trust account at closing.

The tax court found as well that the $1.4 million "loan" from Shapiro was a sham. First, the loan was entirely undocumented; there was no promissory note or other writing setting forth the terms of the loan. It had no interest rate and was "repaid" immediately, with the money cycling into and out of the trust account on the same afternoon. Finally, the loan receivable posted on Woodside's books was (to use the tax court's words) "a mere accounting device, devoid of substance." Neither Midcoast nor Shapiro owed Woodside anything, and the loan receivable was later marked "paid" without a cent changing hands. Looking past the form of the transaction to its substance, the court found that the stock sale was in reality a liquidation: The funds received by the

---

[7] For the different formulations of the doctrine, see generally 1 BORIS I. BITTKER & LAWRENCE LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 4.3.4A (3d Ed. 1999 & 2012 Cum. Supp. No. 3).

shareholders came not from Midcoast but from Woodside's cash reserves.

Turning to the economic-substance analysis, the tax court noted that the transaction was "all about <u>creating</u> tax avoid-ance" and thus lacked any valid nontax business purpose. The shareholders had argued that the liability cap for future personal-injury claims represented a valid, nontax business purpose sufficient to stave off recharacterization. The court rejected this argument, holding that the risk of future losses from injury claims was not great, so the shareholders "had little basis for being concerned for their potential personal liability on unknown claims and lawsuits." The court also noted that no liability claims were imminent, and the ranch's experience over many decades showed that personal-injury claims were infrequent and usually settled for small in-kind payments. Finally, the court noted that the shareholders did not consider the risk of loss from accident claims significant enough to justify carrying liability insurance, so capping liability was not a plausible nontax business purpose for the transaction.

The shareholders attack these findings in several respects. First, they argue that the transaction had economic substance because the passing of title to Woodside's stock changed the legal relationship between the parties. But a sham transaction will always change the legal relationship between parties in *some* way. Although the stock changed hands, the transaction lacked independent, nontax economic substance because Woodside had divested itself of all tangible assets and was not

a going concern. Its shares represented nothing more than the right to withdraw cash and the duty to pay taxes.

Second, the shareholders continue to insist that the personal-injury liability cap demonstrates that the transaction had valid, nontax economic substance. But the tax court's contrary conclusion easily survives clear-error review. The undisputed evidence established that over many decades of operation, Woodside had experienced relatively few personal-injury claims, and most were settled in kind and did not require large monetary payment. There were no known injury claims pending or imminent, and no evidence suggested that the shareholders were exposed to significant risk of loss from unknown future claims dating from Woodside's activities before the asset sale. The shareholders argue that the tax court overemphasized Woodside's practice of not carrying liability insurance. They have a point; considering the high cost of coverage, this fact may not deserve much weight. But the tax court's finding that the stock sale lacked bona fide nontax economic substance is otherwise well supported by the record.

Moreover, even when a transaction has *some* degree of nontax economic substance, the substance-over-form principle may provide an independent justification for recharacterizing it. *See Altria Grp., Inc. v. United States*, 658 F.3d 276, 291 (2d Cir. 2011) ("The substance over form doctrine and the economic substance doctrine are independent bases to deny a claimed tax deduction."); *BB&T Corp. v. United States*, 523 F.3d 461, 477 (4th Cir. 2008) ("Accordingly, although we decline to resolve whether the transaction as a whole lacks economic sub-stance … , we conclude that the Government was entitled to

recognize that [transaction] for what it was, not what [the taxpayer] professed it to be."); *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 231 (2d Cir. 2006) ("The IRS, however, is entitled in rejecting a taxpayer's characterization of an interest to rely on a test less favorable to the taxpayer, even when the interest has economic substance.").

And the tax court correctly concluded that this transaction has the hallmarks of a de facto liquidation. Woodside carried on no business activity, its only asset was cash from the asset sale, and the shareholders had planned to liquidate. The $1.4 million loan from Shapiro was "a ruse, a recycling, a sham," as the tax court quite reasonably found. Remove the Shapiro loan from this transaction and nothing of consequence changes—the shareholders get paid the same amount, from the same trust account, on the same day. What remains after disregarding the sham loan is a transfer of cash from Woodside to the trust account and then to an LLC owned by the shareholders established for the sole purpose of receiving the proceeds of the transaction. In reality, the only money that changed hands was Woodside's cash reserves. At the end of the day (literally!) Woodside's shareholders received the lion's share of the proceeds of the asset sale.

On these facts it was entirely reasonable for the tax court to conclude that this was a liquidation "cloak[ed] … in the trappings of a stock sale." Having received Woodside's cash in a de facto liquidation, the shareholders are transferees under § 6901. *See Owens v. Comm'r*, 568 F.2d 1233, 1239–40 (6th Cir. 1977) (holding that a stock sale with similar characteristics was

merely an exchange of cash that could be disregarded for income-tax purposes).

**B. Transferee Liability Under Wisconsin Law**

Establishing transferee status under § 6901 is only the first step in the analysis. The Commissioner also must establish substantive liability under state law. *Stern*, 357 U.S. at 45. Here, the tax court found the shareholders liable under two constructive-fraud provisions of the Uniform Fraudulent Transfer Act ("UFTA"), codified in Wisconsin at WIS. STAT. §§ 242.04(1)(b), 242.05(1), and also under a provision in Wisconsin's law of corporate dissolution, *id*. § 180.1408.

When substantive liability is grounded in the law of fraudulent transfer, the issue of transferee status arises at this second step in the analysis as well. The Commissioner takes the position that transferee status need only be determined once. In other words, if the court recharacterizes or collapses a transaction to determine transferee status under § 6901, then substantive liability is determined by applying state law to the transaction *as recast under federal law*. The shareholders argue that the two inquiries—transferee status under § 6901 and substantive liability—are independent.

The Commissioner's position is hard to square with the Supreme Court's decision in *Stern*. As we've explained, *Stern* held that § 6901 is "purely a procedural statute," 357 U.S. at 44, and "neither creates nor defines a substantive liability but provides merely a new procedure by which the Government may collect taxes," *id*. at 42. Accordingly, when the

Commissioner invokes § 6901 to collect an unpaid tax debt from a transferee, the federal government's substantive rights as a creditor "are precisely those which other creditors would have under [state] law." *Id*. at 47. This suggests that transferee status under § 6901 and substantive liability under state law are separate and independent inquiries.

Every circuit that has addressed this question has rejected the Commissioner's position and instead required independent determinations of transferee status under federal law and substantive liability under state law. *See Salus Mundi Found. v. Comm'r*, No. 12–72527, 2014 WL 7240010, at *1 (9th Cir. Dec. 22, 2014) ("We conclude that the two requirements of 26 U.S.C. § 6901—transferee status under federal law and substantive liability under state law—are separate and independent inquiries."); *Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 185 (2d Cir. 2013) ("This symmetry of rights contemplated under the statute must lead to the conclusion that the requirements of § 6901 are indeed independent."); *Frank Sawyer Trust of May 1992 v. Comm'r*, 712 F.3d 597, 605 (1st Cir. 2013) ("While it is true that the IRS can only use the § 6901 procedural mechanism to collect taxes from a 'transferee' as that term is defined by federal law, *see* 26 U.S.C. § 6901(h), it is also true that the IRS can only rely on the Massachusetts Uniform Fraudulent Transfer Act to collect from a 'transferee' as that term is construed for the purposes of state law."); *Starnes v. Comm'r*, 680 F.3d 417, 429 (4th Cir. 2012) ("In short, we conclude *Stern* forecloses the Commissioner's efforts to recast transactions under federal law before applying state law to a particular set of transactions. An alleged transferee's substantive liability for another taxpayer's unpaid taxes is purely a question of state

law, without an antecedent federal-law recasting of the disputed transactions.").

This conclusion flows from *Stern*'s twin holdings that (1) § 6901 is a procedural statute only; and (2) state law defines both the existence and the extent of substantive liability, placing the federal government in no better position than any other creditor. Allowing federal tax doctrines to dictate substantive outcomes under state law could give the federal government an advantage over other creditors. *See Salus Mundi Found.*, 2014 WL 7240010, at *7–8; *Diebold*, 736 F.3d at 185; *Frank Sawyer Trust*, 712 F.3d at 604–05; *Starnes*, 680 F.3d at 428–30. The decisions of our sister circuits rest on a sound reading of *Stern.* We see no reason to disagree.

But the independent state-law inquiry will make a difference in the outcome only when there is a conflict between the applicable federal tax doctrine and the state law that determines substantive liability. *See, e.g., Diebold*, 736 F.3d at 185 (noting that recasting a transaction under state law "may require, as it does in this case, a different showing" than doing so under federal law). We have no such conflict here. Wisconsin's version of the UFTA, like § 6901, defines the term "transfer" very broadly: "'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." WIS. STAT.

§ 242.01(12).[8] Nothing suggests this definition is narrower than the definition in § 6901.

Moreover, state fraudulent-transfer law is itself flexible and looks to equitable principles like "substance over form," just like the federal tax doctrines we have explained above. *See Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) (applying Indiana law and citing DOUGLAS G. BAIRD, ELEMENTS OF BANKRUPTCY 153–54 (4th ed. 2006)). More to the point here, Wisconsin's codification of the UFTA expressly incorporates equitable principles, WIS. STAT. § 242.10 ("Unless displaced by this chapter, the principles of law and equity … supplement this chapter."), and Wisconsin has long followed the general rule that "[e]quity looks to substance and not to form," *Cunneen v. Kalscheuer*, 206 N.W. 917, 918 (Wis. 1926).

Wisconsin courts use the "substance over form" principle in a variety of contexts, most notably including tax cases. *See, e.g.*, *Wis. Dep't of Revenue v. River City Refuse Removal, Inc.*, 712 N.W.2d 351, 363 n.19 (Wis. Ct. App. 2006) (explaining that the substance-over-form principle governs the treatment of a

---

[8] The definition of "transfer" in the UFTA is largely based on the definition of "transfer" found in the Bankruptcy Code, UNIF. FRAUDULENT TRANSFER ACT § 1 cmt. 12, 7A(II) U.L.A. 17 (2006), which we have called "expansive," *Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 564 (7th Cir. 2001); *see also In re Bajgar*, 104 F.3d 495, 498 (1st Cir. 1997) ("The Bankruptcy Code, moreover, defines the term 'transfer' broadly … . [T]he legislative history of Section 101(54), which defines 'transfer,' explains that '[t]he definition of transfer is as broad as possible.'" (quoting S. REP. NO. 989, 95th Cong. 27 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5813; H.R. REP. NO. 595, 95th Cong. 314 (1977)))."

taxpayer's activities and transactions for tax purposes); *G & G Trucking, Inc. v. Wis. Dep't of Revenue*, 672 N.W.2d 80, 85–86 (Wis. Ct. App. 2003) (same); *see also Gebhardt v. City of West Allis*, 278 N.W.2d 465, 467 (Wis. 1979) (same); *In re Mader's Store for Men, Inc.*, 254 N.W.2d 171, 184–85 (Wis. 1977) (characterizing a loan in receivership proceedings); *State v. J. C. Penney Co.*, 179 N.W.2d 641, 647 (Wis. 1970) ("In cases of alleged usury, this court will look through the form of the agreement to the substance."). In light of the broad definition of "transfer" in Wisconsin fraudulent-transfer law and the general applicability of substance-over-form analysis, the shareholders are properly deemed to be transferees under state law as well as federal.

The shareholders insist that the stock sale cannot be "recast" or "recharacterized" under Wisconsin fraudulent-transfer law unless the Commissioner proves that they knew Midcoast's scheme was an illegal tax shelter or was otherwise fraudulent.[9] They cite no authority for this proposition, and indeed, Wisconsin law is to the contrary. The Wisconsin Supreme Court has explained that subjective intent and good faith play no role in the application of the constructive-fraud provisions of Wisconsin's UFTA. *See Badger State Bank v. Taylor*, 688 N.W.2d 439, 447–49 (Wis. 2004) ("The focus in 'constructive

---

[9] At trial the parties stipulated that although the shareholders "knew or should have known that Midcoast intended to claim a loss to offset the gain on the asset sale, they did not know and had no reason to know that respondent [IRS] would characterize it as an abusive tax shelter and/or disallow the loss." As we explain in the text, under the constructive-fraud provisions of the Wisconsin UFTA, whether the shareholders knew the scheme was illegal or fraudulent is irrelevant.

fraud' [cases] shifts from a subjective intent to an objective result."). So the shareholders' extensive emphasis on their due diligence and lack of knowledge of illegality is simply beside the point.

Moving now to the tax court's application of the constructive-fraud provisions of the Wisconsin UFTA, we find no error. Under section 242.04(1)(b), a transferee is liable to a creditor whose claim arose before *or* after the transfer if the debtor made the transfer "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation," and "[i]ntended to incur, or believed or *reasonably should have believed* that the debtor would incur, debts beyond the debtor's ability to pay as they became due." WIS. STAT. § 242.04(1)(b)(2) (emphasis added). Under section 242.05(1), a transferee is liable to a creditor whose claim arose *before* the transfer if the debtor made the transfer "without receiving a reasonably equivalent value" and "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *Id*. § 242.05(1).

The tax court found the shareholders liable for Woodside's tax debt under both provisions. As a threshold matter, the asset sale — the triggering event for the tax liability — occurred before the transfer of Woodside's cash to the shareholders, so both constructive-fraud provisions are in play.[10] The tax court found

---

[10] In their reply brief, the shareholders argue for the first time that the Commissioner failed to prove several elements of UFTA liability, including whether the IRS was a creditor at the relevant time; they also assert a good-faith defense under section 242.08 of the Wisconsin Statutes. These

(continued...)

that the cash from Woodside's asset sale was transferred to the shareholders "without receiving a reasonably equivalent value," a requirement common to both constructive-fraud provisions. Indeed, the court found that Woodside received nothing. The court also found that the transaction left Woodside insolvent, a requirement for liability under section 242.05(1). Woodside's tax liability exceeded $750,000, and it had just under $453,000 cash remaining after the shareholders were paid.[11] *See id.* § 242.02(2) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.").

The shareholders' only challenge to these findings is an unsupported and implausible claim that the $1.2 million loan receivable had real value. As we've explained, however, the tax court found that the Shapiro loan and the receivable were mere accounting tricks devoid of actual substance or value: a sham loan begat a sham receivable. The record amply supports this finding.

Finally, the tax court found that the shareholders knew or should have known that Woodside's federal tax liability could not and would not be paid. This finding is also well supported by the record. What was left in Woodside's new bank account

---

[10] (...continued)
arguments come far too late. *See Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012) ("[A]rguments raised for the first time in a reply brief are deemed waived.").

[11] Moreover, Midcoast drained most of the remaining cash from the corporation within four days of the closing.

after the transaction was insufficient to cover the tax liability. And the entire transaction was premised on the assumption that Midcoast would offset the tax liability by a net-operating-loss carryback; in other words, the transaction was premised on the assumption that the taxes would *not* be paid. Or as the tax court put it, the "record is replete with notice to [the shareholders] that [Midcoast] never intended to pay Woodside Ranch's [f]ederal income tax liability."

Accordingly, we conclude that the tax court did not clearly err in finding the shareholders liable for Woodside's tax debt under sections 242.04(1)(b) and 242.05(1). This conclusion is sufficient to sustain transferee liability under § 6901; we do not need to address the tax court's alternative findings under section 180.1408, the corporate dissolution statute.

AFFIRMED.